# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-01987-SCT

*INTOWN LESSEE ASSOCIATES, LLC; INTOWN
LESSEE SERVICES, LLC; IT TENANT RBS, LLC;
AND TIMOTHY TUCKER*

*v.*

*MICHAEL KEITH HOWARD, INDIVIDUALLY,
AND SHANNON POOLE, INDIVIDUALLY*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/2009 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| | FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | WILLIAM 'TREY' JONES, III |
| | JOSEPH ANTHONY SCLAFANI |
| ATTORNEYS FOR APPELLEE: | JAMES ASHLEY OGDEN |
| | JAMES W. SMITH, JR. |
| | WENDY MICHELLE YUAN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 06/30/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.    Michael Howard and Shannon Poole were awarded a four-million-dollar jury verdict

against InTown,[1] an extended-stay motel, for injuries each sustained as victims of an armed

---

[1]InTown Lessee Associates, LLC, InTown Lessee Services, LLC, IT Tenants RBS,
LLC, and Timothy Tucker will collectively be referred to as "InTown."

robbery in the motel. Aggrieved, InTown appealed. Finding no error, this Court affirms the trial court's judgment.

**Facts**

¶2.     Michael Keith Howard and Shannon Poole had rented a room at InTown in June 2008, where the couple temporarily resided while waiting for a home to become available in Belhaven, a residential area in Jackson, Mississippi. On June 27, 2008, at approximately 9:30 p.m., Howard left the motel room to take his dog for a walk. As he was returning to the room, three men burst through the door, demanded money from the couple, and ransacked the room. One of the assailants hit Howard in the face with a hand gun, then pointed the gun at Poole's head and demanded money. Howard and Poole denied having money in the room. Undeterred, one of the assailants flipped the mattress off the bed, while Poole was on top of the mattress, causing her to be pushed against a wall. The men found between $700 and $900 under the mattress. The assailants took the money, Howard's and Poole's drivers' licenses, and Poole's cell phone. Following the altercation, Howard and Poole were treated for various injuries that each had sustained during the attack. Initially, Howard was treated for broken bones in his face and numerous contusions and lacerations to his body. Prior to trial, Howard had to undergo facial reconstructive surgery. Poole sustained contusions and bruises in the attack, followed by soreness and severe psychological damage. Howard and Poole were under the continuing care of physicians and psychiatrists. No arrests were made in connection with the armed robbery and physical assaults.

¶3.     Howard and Poole filed their joint complaint against the defendants on July 18, 2008, alleging: (1) that they were invitees of InTown; (2) that they were seriously injured because

2

the defendants had failed to fulfill their joint, several, and collective duties to use reasonable care and to take adequate and reasonable security precautions or measures to protect invitees of InTown, including the plaintiffs, from foreseeable harm and danger, including the harm suffered by Plaintiffs; (3) that, before June 27, 2008, InTown knew or should have known that it had inadequate security, that strangers, trespassers and loiterers frequently came onto its property, that the wooden fence surrounding part of its property was in disrepair, that the locks on the guest room doors were not working properly, and that the property was not reasonably safe; (4) that InTown had failed to remedy or repair the unsafe conditions and inadequacies of the property; (5) that InTown had a duty to the plaintiffs to make sure that the facilities, including all common areas, as well as guest rooms, were secure, safe, and fit for their particular purposes, that reasonable security measures were provided and maintained, that the property, including the fences surrounding part of the property and the locks on all guest room doors, were properly maintained, and that general upkeep of the property was performed; (6) that InTown had specific control and authority to make management decisions material to the personal safety and security of the plaintiffs; (7) that InTown had specific control and authority to make management decisions pertaining to the hiring, firing, and suspension of employees or security at the motel; (8) that InTown's agents and/or employees had warranted and/or covenanted that the property where Howard and Poole were staying as invitees was secure, safe, fit for its particular purpose, properly maintained, under proper upkeep, and reasonable security measures were provided and maintained for the plaintiffs, that security would be adequate to both protect the room where the plaintiffs were staying, as well as control and maintain the property and enforce security

3

procedures, including but not limited to stopping loiterers and trespassers from entering the property and/or removing trespassers and loiterers from the property; (9) that InTown had failed to provide adequate first aid to the plaintiffs and had failed to instruct its employees on providing first aid to the plaintiffs; and (10) that InTown had failed to warn Howard and Poole of the atmosphere of violence that existed on and around the property, had failed to provide notice of the prior crimes occurring on and around the property, and had failed to warn the plaintiffs of the previous assaults and robberies occurring on and around the property.

¶4. Trial commenced on September 21, 2009, and the jury returned a general verdict in favor of Howard and Poole on September 23, 2009.

¶5. Numerous Jackson police officers testified at trial regarding calls for service at InTown. One officer had been called to InTown Suites as many as thirty times to respond to "armed robberies, auto burglaries, car jackings, just auto thefts; different things of that nature . . . primarily major crimes." The officer had advised the manager of InTown that the crime problem on the property could be eliminated by hiring professional security.

¶6. A lieutenant with the Jackson Police Department testified that "InTown Suites . . . had a number of problems on their property. Specifically they've had robberies. They've had burglaries. Cars have been stolen. There's prostitution, drugs on the property; just anything you can think of." The lieutenant testified that he was "advised that [InTown] had a courtesy officer. He was not a security officer, nor a security guard . . . . [T]he difference is a courtesy officer, he was not armed and was not properly trained to handle any type situations that would come up. He was only to call the police . . . if he saw something there on the

4

property criminal in nature." The lieutenant also testified that he had told the manager of InTown that off-duty officers "would be more than willing to come out there and work off duty after we got off work to patrol the property . . . ." The lieutenant further testified that he had instructed the manager that InTown should be informing its customers of the problems that had been occurring on the property, and that the manager had indicated that InTown would have no customers if such a warning were given.

¶7. Another officer testified that he was a part of the "delta strike force," which the Jackson Police Department had formed in an effort to deter crimes along the Interstate 55 corridor. He testified that InTown Suites was a target area that the delta strike force was to patrol. He explained that the delta strike force's duty was to "go through [InTown's] parking lot, make sure there was no cars broke into, no illegal happenings on the streets or on the property itself. Mostly we were there to try to answer calls and be quick as possible in responding to calls that may happen at InTown Suites or other locations." He also testified that, when the task force was on InTown property, no criminal activity transpired. He further testified that he had informed the manager of InTown that there was a crime problem on its property and that "they should try to go ahead and get a professionally trained security service" to solve the crime problem on the property.

¶8. Charles Campbell, the property manager of InTown Suites in Jackson on the date that Howard and Poole were attacked in their room, testified that one of InTown's duties was "to ensure that customers were provided adequate protection from crime that would occur on the property." He also testified that he was in contact with his regional manager on a daily basis and that he often informed regional and corporate officials that there was a crime problem

5

at the Jackson property. Campbell testified that he had asked his regional manager to provide security at the Jackson location of InTown Suites on more than one occasion, and that the regional manager always had told him that InTown had insufficient funds to hire armed security.

¶9. Several expert witnesses also were called to testify. Kenneth Goodrum, a commander with the Jackson Police Department, was accepted without objection as a plaintiffs' expert "in the area of security with emphasis in the area of premises." Commander Goodrum testified that he had reviewed "all the documentation and the evidence that was given to [him,] as well as the depositions and offense reports" in this case. Commander Goodrum had completed a crime history report of the Jackson location of InTown, and was able to determine that, in the two-and-a-half-year period prior to Howard and Poole's injuries, "eight armed robberies, 32 auto thefts, 55 auto burglaries, six hold-up alarms, 15 simple assaults . . . three armed robberies of businesses, four men with a gun, two vandalisms, 48 disturbances and 12 threats" had occurred on the property of InTown. Without objection, Commander Goodrum testified that the assault of Michael Howard and Shannon Poole "was preventable. And my opinion is that if they would have hired off-duty police officers or armed security guards to patrol that parking lot and patrol their property, it would have been able to be prevented."

¶10. Plaintiffs deposed David Groves, a regional director of operations for InTown. Groves testified that approximately twelve InTown properties have armed security on the property, and that the decision to provide armed security guards at a particular property is decided on a case-by-case basis. Groves said that the general manager would have to request

6

that armed security be provided, and then the decision to provide security personnel would be up to InTown's corporate officials. Part of Groves's deposition was read into the record at trial. InTown objected, but the trial court reasoned that "it still is a part of that testimony which shows notice with reference – and it goes to the issue of foreseeability, which is an issue in this case. And I think it probably deals with the issue of security in its entirety. As such, I'm going to allow the testimony with reference to . . . Groves."

¶11. The plaintiffs offered an economist, who testified regarding Poole's claim for future loss of wages. The economist opined that Poole's future loss of income ranged from $574,209 to $1,922,589. InTown did not object at trial to the testimony or methodology of the economist. Dinesh Goel, M.D., a board-certified general surgeon and accepted expert in the fields of general surgery and family medicine, testified at trial. Dr. Goel had treated both Howard and Poole for their injuries sustained after being attacked at InTown. Dr. Goel testified that Howard was treated for a fractured cheek bone and orbit bone of his left eye, which required multiple surgeries. Dr. Goel did not perform Howard's surgeries; however, he had reviewed the surgical records. Dr. Goel further testified that Howard would need additional surgeries to correct those injuries completely. Dr. Goel said that the estimated cost of Howard's future surgery would be between $5,000 and $8,000.

¶12. Dr. Goel testified that, in addition to Howard's badly broken cheek bone and orbit bone, he had suffered a broken jaw, a head injury, and a bulging disk. Additionally, Howard had suffered post-traumatic stress disorder as a result of the attack at InTown. As a result of his injuries and post-traumatic stress disorder, Howard had headaches, nightmares, sleep loss, and exhibited symptoms of depression, for which Dr. Goel had referred Howard to a

7

psychiatrist for treatment. Dr. Goel further testified that he did not "expect [Howard's symptoms] to get cured, but they're going to wax and [wane]. They're going to get better at times, they're going to get worse at times, but he's going to live with it."

¶13. Regarding Dr. Goel's future treatment of Howard, he testified that Howard would "need a follow-up on a monthly basis and even quarterly later on," and that the cost of that treatment would be approximately $3,000 to $4,000 per year, plus the cost of medications.

¶14. Dr. Goel testified that Poole had suffered head, back, and neck injuries as a result of being attacked at InTown on June 27, 2008. He said that he initially had treated her with pain medications, and later referred her to a psychiatrist for treatment of her post-traumatic stress disorder, headaches, nightmares, and sleep loss. Dr. Goel said that Poole would need to have medical follow-ups on a regular basis, and that the future cost of her medical care would be approximately $1,000 to $2,000 per year. Further, Dr. Goel said that her condition is "going to wax and [wane], but it's not going to go away. It's been more than a year she's been hurting and suffering with it. I think she's going to stay with it."

¶15. Krishan Gupta, M.D., a psychiatrist, treated Howard and Poole for post-traumatic stress disorder. Dr. Gupta testified that his initial diagnosis of Howard was "adjustment disorder and acute stress disorder. As time progresses, we can find the signs and symptoms of post traumatic stress disorder. And we gave a diagnosis of post traumatic stress disorder." Dr. Gupta also testified that Howard was "doing a little better, but still needs continuous psychotherapy and medication management." Dr. Gupta further testified that post-traumatic stress disorder "is a psychological scar in the brain. This will not go away. It's not a

physical injury you can see like [Howard's] face was reconstructed, but psychological cannot be. So they're going to be there as long as [Howard] is living on this earth."

¶16. Dr. Gupta said that "in the initial evaluation [Poole] was very anxious, so I gave her a diagnosis of acute stress disorder. As the time progressed as we understand more about [Poole], we gave a diagnosis of post traumatic stress disorder later on." Dr. Gupta said that Poole had suffered from panic attacks, but that most of the panic attacks were from her post-traumatic stress disorder. Further, Dr. Gupta testified that Poole was "not making much progress. She needs more counseling, and she needs more intensive therapies which will help her to come out and function like [Howard] is doing right now. [Howard] is holding a job at this time. [Poole] is not able to do that at this time at all." He also said that Poole would need continued treatment with medication.

¶17. Dr. Gupta testified that, over the lifetime of both Howard and Poole, the cost of each individual's psychiatric treatment would be, at a minimum, $500,000.

¶18. At the close of the plaintiffs' case-in-chief, InTown rested without presenting evidence. The jury returned a general verdict in the amount of $2,000,000 for Howard and $2,000,000 for Poole.

## Issues

¶19. On appeal, InTown raises the following issues:

I. Whether the trial court erred in denying InTown's motion for directed verdict and motion for JNOV.
II. Whether InTown owed a duty to Plaintiffs to warn them of the alleged generalized "atmosphere of violence" on and around the Jackson property.
III. Whether the cumulative effect of the admission of irrelevant and inadmissible evidence was highly prejudicial to InTown.

9

IV. Whether the trial court erred by refusing InTown's comparative negligence instructions.

V. Whether the trial court failed to comply with the statutory cap on noneconomic damages; alternatively, whether the trial court erred in denying InTown's request for remittitur.

**Discussion**

*I. Whether the trial court erred in denying InTown's motion for directed verdict and motion for JNOV.*

¶20. At the close of all of the evidence, InTown moved for a directed verdict on the issue of causation. InTown began its argument with the following statement: "I realize the plaintiffs have established a duty was owed, and that's admitted. But I believe the plaintiffs have failed to establish . . . that regardless of security that was present or regardless of any actions that were taken, the plaintiff failed to show that any additional security or any additional acts could have prevented the event from happening." The trial court denied InTown's motion for directed verdict. InTown filed a post-trial "Motion for Judgment Notwithstanding the Verdict, or in the alternative, Motion for a New Trial, or, in the alternative, Motion for a Remittitur and/or Motion to Amend the Verdict," arguing that "[t]he jury's verdict reflected a finding that the alleged inadequacy of security was the proximate cause of the Plaintiffs' [injuries]" because "the evidence presented at trial failed to establish that this alleged inadequate security was the sole cause of the subject incident." The trial court denied InTown's post-trial motion.

¶21. On appeal, InTown argues that Howard and Poole "failed to meet their burden to establish that the proximate cause of their assault was the failure of InTown to employ an armed, off-duty JPD officer to provide security at the Jackson property." InTown argues that

10

the plaintiffs "were required to proffer sufficient evidence to establish that the failure of InTown to employ an armed, off-duty JPD officer was a substantial factor in bringing about their injuries, and had InTown employed an armed, off-duty JPD officer the harm would not have occurred." Further, InTown alleges that "[t]he only record evidence on the issue of whether InTown's failure to employ an armed, off-duty officer was the proximate cause of Plaintiffs' assault is the conclusory statement of Plaintiffs' proffered 'expert' JPD Officer Kenneth Goodrum." InTown argues that the plaintiffs failed to meet that burden; therefore, it was entitled to a judgment notwithstanding the verdict. We disagree and affirm the trial court on this issue.

¶22. "The standard of review for the denial of a motion for a judgment notwithstanding the verdict (JNOV) is *de novo*." *U.S. Auto. Ass'n (USAA) v. Lisanby*, 47 So. 3d 1172, 1176 (Miss. 2010) (citing *U.S. Fid. and Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 964 (Miss. 2008)). "A motion for JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of a JNOV if there is substantial evidence to support the verdict." *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 948 (Miss. 2008) (citing *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 22 (Miss. 2007)). "This Court will consider the evidence in the light most favorable to the appellee, giving the party the benefit of all favorable inference[s] that may be reasonably drawn from the evidence." *Spotlite Skating Rink, Inc. v. Barnes ex rel. Barnes*, 988 So. 2d 364, 368 (Miss. 2008) (quoting *Ala. Great S. R.R. Co. v. Lee*, 826 So. 2d 1232, 1235 (Miss. 2002)). "In essence, judgments as a matter of law present both the trial court and the appellate court with the same question – whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so

deficient, that the necessity of a trier of fact has been obviated." *USAA*, 47 So. 3d at 1176

(quoting *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006)). "[T]his Court applies the same

standard of review as it applies when reviewing the denial of directed verdict or JNOV."

*Solanki v. Ervin*, 21 So. 3d 552, 557 (Miss. 2009).

¶23.    The substantial evidence submitted by the plaintiffs was more than legally sufficient,

and included a stipulation that InTown's management and employees had been the victims

of three armed robberies that had closely preceded these attacks.[2]  InTown rested without

calling a single witness to rebut the plaintiffs' substantial lay and expert witness testimony.

By the presentation of their lay and expert witnesses, the plaintiffs had created a question

sufficient for the jury's determination.  The evidence, as applied to the plaintiffs' case, is not

"so indisputable, or so deficient, that the necessity of a trier of fact has been obviated."

*USAA*, 47 So. 3d at 1176.

II.     *Whether InTown owed a duty to the plaintiffs to warn them of the alleged generalized
        "atmosphere of violence" on and around the Jackson property.*

¶24.    InTown argues for the first time on appeal that the trial court erred in giving a jury

instruction that provided that the jury could find against InTown if it found that InTown had

failed "to warn Michael Keith Howard and Shannon Poole of the existence of a known

dangerous condition."   InTown argues that Jury Instruction Number 11 "improperly

permitted the jury to find InTown liable if the jury agreed with Plaintiffs' novel theory and

---

[2]These armed robberies occurred on November 6, 2007, January 3, 2008, and May
23, 2008.

12

believed that InTown breached a duty to warn Plaintiffs of the generalized 'atmosphere of violence' on and around the Jackson property."

¶25.    This Court "has held that unless substantial rights are affected, issues not presented to the trial judge are procedurally barred from being raised for the first time on appeal." ***Ill. Cent. R.R. Co. v. Byrd***, 44 So. 3d 943, 948 (Miss. 2010) (citing ***Dora v. State***, 986 So. 2d 917, 925 (Miss. 2008)).   Intown did not make a contemporaneous objection to jury instruction number 11.  InTown was afforded an opportunity to object to the plaintiffs' theory of liability and supporting jury instruction before the trial court; however, InTown failed to avail itself of that opportunity, and is procedurally barred from attempting to do so for the first time on appeal. ***Id.***

III.    *Whether the cumulative effect of the admission of irrelevant and inadmissible evidence was highly prejudicial to InTown.*

¶26.    InTown argues that the "trial court erred in admitting testimony regarding (a) the profitability of the Jackson property; (b) armed security provided by InTown at other locations across the South without requiring Plaintiffs to lay a proper foundation that the circumstances surrounding those other properties were similar to the circumstances surrounding the Jackson property; and (c) the alleged motive/reason why InTown did not employ an armed, off-duty JPD officer at the Jackson property."

¶27.    "The standard of review regarding admission or exclusion of evidence is abuse of discretion.  Where error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" ***Whitten v. Cox***, 799

13

So. 2d 1, 13 (Miss. 2000) (quoting *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (Miss. 1999)).

> A. *Whether the trial court erred in allowing Howard and Poole to offer evidence regarding the financial condition/profitability of the Jackson property.*

¶28.   InTown argues that it was highly prejudicial for the trial court to allow the plaintiffs to adduce testimony regarding the profitability of InTown for the year preceding the armed robbery of Howard and Poole.   However, InTown failed to make a contemporaneous objection to this line of questioning at trial.[3]   Our longstanding case law is clear "that the failure to make a contemporaneous objection to the evidence waives the issue on appeal." *Hyundai Motor America v. Applewhite*, 53 So. 3d 749, 755 (Miss. 2011).   Because InTown did not make a contemporaneous objection to the plaintiffs' eliciting InTown's profitability for the year 2007, it is procedurally barred from pursuing the issue for the first time on appeal.

> B. *Whether the trial court erred in allowing Howard and Poole to offer evidence regarding armed security provided by InTown at other locations across the South without requiring them to lay a proper foundation for such evidence.*

¶29.   Portions of the deposition of David Groves were read in the presence of the jury, over InTown's objection.   The trial court allowed the evidence to be presented to the jury, reasoning that "it still is a part of that testimony which shows notice with reference – and it goes to the issue of foreseeability, which is an issue in this case.   And I think it probably deals with the issue of security in its entirety.   As such, I'm going to allow the testimony with reference to . . . Groves."   Assuming, *arguendo*, that the admission of this evidence was in

_____

[3]InTown objected to plaintiffs' counsel leading the witness during that line of questioning, but failed to object to the substance of the questions and answers.

error, the remaining evidence of foreseeability and need for additional security was clearly established, and was not contested by the appellants.[4]  The admission of that portion of Groves's deposition did not affect a substantial right belonging to InTown. *See **Whitten***, 799 So. 2d at 13.

> C.      *Whether the trial court erred in allowing Howard and Poole to offer evidence regarding the alleged motive/reason why InTown did not employ an armed, off-duty JPD officer at the Jackson property.*

¶30.    InTown argues that plaintiffs' counsel improperly argued that InTown's motive for not employing an armed security officer was because InTown did not want to provide the funding for such an officer.  InTown argues for the first time on appeal that plaintiffs' counsel made inappropriate comments during opening arguments.  InTown did not make a contemporaneous objection to plaintiffs' counsel's opening argument.

¶31.    InTown also complains of the following questions by plaintiffs' counsel and Charlie Campbell's responses:

> Q.     Did [InTown's regional manager] ever ask about security at the property?
> A.     No.  We talked about it, but I mean it really didn't do any good to talk about it because the answer was always we don't have the money.
> . . .
> Q.     What, if anything, did you ask from corporate after the second robbery?
> A.     I asked if they could either get me a bullet proof glass up there or armed security.
> Q.     What was corporate's response to your request as the manner of InTown Suites?
> A.     We don't have the money for that.
> . . .
> Q.     All right.  Is there any doubt in your mind that the information you're sending to corporate, that it's getting there?
> A.     Oh, yes, it was getting there.

---

[4]Appellants' motion for directed verdict was based on causation, see *supra* ¶ 22.

15

Q. How do you know it's getting there?
A. Because of discussions with my boss at the time.
Q. What discussions were you having?
A. I mean I would ask – if he'd come by, I'd ask, you know, what are we going to do about security. And his answer was always we don't have the money, you know. And I finally asked do we have the money for my life, you know, and didn't get an answer.

InTown failed to interpose a contemporaneous objection to that line of questioning. Because of its failure to make a contemporaneous objection to the opening statement or the questions on cross-examination, InTown waives the issue on appeal; InTown is procedurally barred from raising this issue. *Hyundai*, 53 So. 3d at 755.

IV. *Whether the trial court erred by refusing InTown's comparative negligence instructions.*

¶32. InTown argues that it was entitled to a comparative fault instruction because the jury could have apportioned the Plaintiffs "some fault for their personal injuries." InTown argues that Howard and Poole should have immediately given their money and possessions to the three assailants who had broken into their room, rather than insisting that they did not have money. InTown argues that the plaintiffs' injuries would have been less severe if they had done as the robbers had insisted.

¶33. "It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010). "Jury instructions must fairly announce the law of the case and not create an injustice against the defendant. This rule is summed up as follows: 'In other words, if all instructions taken as a whole fairly, but not necessarily

16

perfectly, announce the applicable rules of law, no error results.'" ***Davis v. State***, 18 So. 3d 842, 847 (Miss. 2009) (quoting ***Milano v. State***, 790 So. 2d 179, 184 (Miss. 2001)).

¶34.    Mississippi Code Section 11-7-15 provides that:

> In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property.

Miss. Code Ann. § 11-7-15 (Rev. 2004).  Moreover, our case law provides that "[e]vidence of the plaintiff's own negligence may operate to reduce the plaintiff's damages.  Indeed, we have a number of cases where we have sensitively assessed a plaintiff's own negligence when he makes the charge that the jury's damage award is grossly insufficient." ***Flight Line, Inc. v. Tanksley***, 608 So. 2d 1149, 1162 (Miss. 1992).  However, we have no case law that supports InTown's argument that the victims of this armed robbery had a duty to mitigate their damages by abiding by the robber's demands.  The cases from other states cited by InTown in support of their argument are clearly distinguishable.  To penalize a crime victim for his failure to cooperate with his assailant would constitute a bizarre and perverse misapplication of the doctrine of comparative fault.  The trial court did not abuse its discretion in denying InTown's request for a comparative negligence instruction.

*V.     Whether the trial court failed to comply with the statutory cap on noneconomic damages; alternatively, whether the trial court erred in denying InTown's request for remittitur.*

¶35.    In its post-trial "Motion for Judgment Notwithstanding the Verdict, or in the alternative, Motion for a New Trial, or, in the alternative, Motion for a Remittitur and/or

Motion to Amend the Verdict," InTown attacked the expert testimony used to calculate the plaintiffs' economic damages, although it had not objected to that testimony at trial. It further argued that "[t]he fact that these two [p]laintiffs were awarded the exact same amount [of damages] after presenting such differing testimony as to how they were affected by this incident, and that their alleged economic losses were significantly different should be overwhelming evidence of bias, passion or prejudice. As a result, the judgment should be reduced." InTown then argued that "Plaintiffs are capped in their recovery for non-economic damages, the judgment is excessive in light of the relevant testimony and Defendants respectfully move [the trial court] for a remittitur or a new trial on the issue of damages." Finally, InTown moved the trial court "for a remittitur or, in the alternative, to amend the judgment to properly reflect an amount in damages which is substantiated by the evidence in law, and to amend the judgment to comply with Mississippi statutory and case law." The trial court denied InTown's post-trial motion.

¶36.   On appeal, InTown argues that the trial court should have given the jury "a verdict form that would require the jury to segregate economic damages from non-economic damages[,] enabling the trial judge to perform her statutory duty to apply the $1,000,000 cap on non-economic damages." InTown also argues that "the failure of the trial judge to either submit to the jury a verdict form that would require the jury to segregate economic damages from non-economic damages, or to inquire of the jury post-verdict how it arrived at its damage calculation requires a new trial." InTown did not object to the jury instruction on the form of the verdict, and InTown did not request a jury instruction that the form of the verdict should segregate economic damages from noneconomic damages.

18

¶37. Finally, on appeal, InTown attacks the plaintiffs' experts' testimony and argues that "[g]iving [the plaintiffs] the benefit of the full $1,000,000 cap on noneconomic damages, the maximum amount of damages, based on the trial testimony, that could have been awarded to Howard is $1,692,400," and the maximum amount of damages "that could have been awarded to Poole is $1,853,800." InTown argues that the trial court erred in denying its remittitur, and that this Court should "order the trial court [to] reduce [the plaintiffs'] damage award . . . ."

> A. *Whether the trial court failed to comply with the statutory cap on noneconomic damages.*

¶38. Mississippi Code Section 11-1-60 provides, in pertinent part, that:

> (2)(b) In any civil action filed on or after September 1, 2004, other than those actions described in paragraph (a) of this subsection, in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than One Million Dollars ($1,000,000.00) for noneconomic damages.
>
> (c) The trier of fact shall not be advised of the limitations imposed by this subsection (2) and the judge shall appropriately reduce any award of noneconomic damages that exceeds the applicable limitation.

Miss. Code Ann. § 11-1-60(2)(b), (c) (Supp. 2010).

¶39. InTown argues that the jury returned a verdict in which it is unable to determine what amount was awarded for economic damages and what amount was awarded for noneconomic damages, and because the two types of damages were indistinguishable, the trial court "erred by failing to take sufficient steps to enable her to discharge her statutory duty to apply the cap on noneconomic damages and reduce the jury verdict in accordance with Miss. Code § 11-1-60(2)(b)." InTown further argues that "[w]hile in some cases it may be possible for the appellate court to review the trial testimony and make a determination regarding the amount

19

of economic and non-economic damages awarded by the jury, in this case, the jury awarded each Plaintiff exactly $2,000,000 in damages based on testimony that provided a range of possible amounts for each element of damages calculation, as opposed to exact amounts for each element of the damage calculation." InTown alleges that "it is not possible for this Court to determine with any degree of accuracy how much the jury awarded each Plaintiff for economic damages and non-economic damages thus enabling this Court to apply the statutory cap on non-economic damages," and asserts that "it should not be deprived of its right to have the statutory cap on non-economic damages applied to Plaintiff[s]' damage awards due to the error of the trial judge."

¶40.    Jury Instruction Number 12 provided that:

> You are instructed that "damages" is the word which expresses in dollars and cents the injury sustained by Michael Keith Howard and Shannon Poole, if any, that you find by a preponderance of the evidence.
> In order to recover damages, they must be shown with reasonable probability both as to their nature and as to their cause. However, a plaintiff does not lose his/her right to recover damages because he/she is unable to prove with absolute certainty the mathematical value of his/her injury. If the cause of the injury is reasonably probable, you may reasonably estimate the damages, and the assessment thereof is with[in] the sole discretion of the jury.

¶41.    Jury Instruction Number 13 provided that:

> The Court instructs the jury that if your verdict be for the Plaintiffs Michael Keith Howard and Shannon Poole of (sic) in this cause, in arriving at the amount of your verdict, you may take into consideration any or all of the following elements of damages, if any, which you find from a preponderance of the evidence in this case to have resulted from the negligence, if any, of the Defendants.
> (a) All past present and future pain, suffering and mental anguish, if any, sustained by the Plaintiffs.
> (b) All past and future lost earnings, if any, proximately resulting from Plaintiff Shannon Poole's injuries.
> (c) Any past and future medical costs and surgeries if any.

20

In arriving at the amount of your verdict, you may award the plaintiffs Michael Keith Howard and Shannon Poole such an amount of money which you feel will adequately and reasonably compensate the Plaintiffs for any and all of the above listed elements of damage, if any, which you find from a preponderance of the evidence in this case to have resulted from the negligence, if any, of the Defendants.

¶42.   Jury Instruction Number 14 provided that:

You are instructed that if you find for Plaintiffs, Michael Howard and Shannon Poole, in this case, you are not authorized to find for any amount beyond reasonable compensation for the injuries sustained, if any.  You are not authorized to award any damages in the nature of a penalty or attorney's fees, nor are you bound by any estimates of damages made by the attorneys representing the parties in this suit.  If you find for the Plaintiffs, you must therefore confine your verdict to a reasonable compensation for the injuries actually sustained, if any, by the Plaintiffs as a result of the incident in question.  You are further instructed that these Defendants are not responsible for any physical or mental problems that the Plaintiffs might have had prior to the incident in question, nor any physical or mental problem that is not related to any injury the Plaintiffs might have suffered as a result of the incident in question.

¶43.   Jury Instruction Number 18 provided that:

The Court instructs you that if you find for the Plaintiffs and against the Defendants your verdict should be in the following form:
"We the jury, find for the Plaintiffs and against Defendants Intown Lessee Associates, LLS; Intown Lessee Services, LLS; IT Tenant RBS, LLC and Timothy Tucker compensatory damages in the amount of $_____ to Michael Keith Howard and compensatory damages in the amount of $ _____ to Shannon Poole."
And you will write your verdict upon a separate piece of paper.
If you find against the Plaintiffs and in favor of the Defendants, then the form of your verdict shall be as follows:
"We the jury find in favor of the Defendants."

¶44.   InTown did not object to these jury instructions.  Because it did not object to the form

of the verdict jury instruction at trial, InTown is procedurally barred from doing so on appeal.

See *Hyundai*, 53 So. 3d at 755.  Additionally, because InTown did not ask the trial court to

give a jury instruction that separated economic and noneconomic damages, it cannot complain on appeal that such an instruction was not given. *See King v. State*, 857 So. 2d 702, 720 (Miss. 2003) (Defendant is "procedurally barred from asserting the absence of an individualized instruction," and "a trial judge will not be put in error on a matter which was not presented to him for his decision."). This Court does not engage in speculation or conjecture, and it would be nothing more than supposition for us to try to guess what amount the jury awarded in economic damages and what amount it awarded in noneconomic damages.

B. *Whether the trial court erred in denying InTown's request for a remittitur.*

¶45. Alternatively, InTown argues that the trial court erred in denying its motion for a remittitur. InTown argues that Howard's damages should be remitted from $2,000,000 to $1,692,400, and Poole's damages should be remitted from $2,000,000 to $1,853,800. InTown argues that Howard's economic damages ranged from $651,800 to $692,400, which would make his damages, at most, $1,692,400, including noneconomic damages, and that Poole's economic damages ranged from $813,400 to $853,800, which would make her damages, at most, $1,853,800.

¶46. "The standard of review for trial court decisions regarding a remittitur is the abuse of discretion standard." *U.S. Fid. and Guar. Co. of Miss.*, 998 So. 2d at 969. "However, this Court has held that it 'has the responsibility to see that such judicial discretion is exercised soundly and, if not, to reverse." *Id.* (quoting *Holmes County Bank & Trust Co. v. Staple Cotton Coop. Assoc.*, 495 So. 2d 447, 451 (Miss. 1986)). The standard for granting an additur or remittitur is whether or not "the court finds that the jury was influenced by bias,

22

prejudice, or passion or . . . if the damages were contrary to the overwhelming weight of credible evidence." ***Rodgers v. Pascagoula Pub. Sch. Dist.***, 611 So. 2d 942, 944 (Miss. 1992).

¶47.    InTown does not cite any law supporting its contention that it is entitled to a remittitur.  *See **Bowen v. State***, 607 So. 2d 1159, 1161 (Miss. 1992) ("An argument unsupported by competent authority will not be considered on appeal); M.R.A.P. 28(a)(6) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.").  Moreover, in light of the general verdict and InTown's failure to request a special verdict or special interrogatories, we cannot conclude that the trial judge abused her discretion in denying the remittitur.

¶48.    Accordingly, the judgment of the Circuit Court of the First Judicial District of Hinds County is affirmed.

¶49.    **AFFIRMED.**

**CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, CHANDLER, PIERCE AND KING, JJ., CONCUR.  WALLER, C.J., NOT PARTICIPATING.**