RUSSELL, J.,
dissenting:
¶ 26. The circuit court listened to testimony from several witnesses, observed their demeanor, and carefully reviewed the evidence submitted by Tamika Foster’s wrongful-death beneficiaries (collectively “Fosters”) and the University of Mississippi Medical Center (UMMC). After observing a trial replete with evidence showing that UMMC’s negligent treatment of Foster had caused her death, the circuit court entered a judgment against UMMC. As I find this Court should defer to the circuit court’s decision and affirm the judgment, which is supported by substantial, credible evidence, I must respectfully dissent.
¶ 27. As the Mississippi Supreme Court recently reaffirmed, “[o]ur longstanding case law is clear that the failure to make a contemporaneous objection to the evidence waives the issue on appeal.” InTown Lessee Assocs., LLC v. Howard, 67 So.3d 711, 719 (¶ 28) (Miss.2011) (citation and internal quotations omitted). While UMMC claims the circuit court improperly relied on the autopsy report that was generated by UMMC’s own pathologists, this issue is, in fact, procedurally barred. At trial, UMMC could have objected to the autopsy report’s admissibility; it did not. Because UMMC failed to challenge the admissibility of the autopsy report at trial, this issue is not properly before this Court.
¶28. Notwithstanding the procedural bar, this Court should reverse and render if considering “the evidence in the light most favorable to the ...” Fosters, the facts “point so overwhelmingly in favor of ...” UMMC’s claims “that reasonable [jurors] could not have arrived at a contrary verdict....” White v. Stewman, 932 So.2d 27, 32 (¶ 10) (Miss.2006) (citations omitted). Thus, our review should focus on whether the circuit judge, as the trier of fact, had substantial evidence before her to determine that the autopsy report was credible and reliable. See Univ. of Miss. Med. Ctr. v. Pounders, 970 So.2d 141, 147 (¶¶ 23-26) (Miss.2007). Here, neither the testimonies of Dr. James Martin and Dr. Baha Sibai nor the 2009 study on the postmortem diagnosis of thrombotic thrombocytopenia purpura (TTP) were sufficient to challenge the autopsy report’s reliability.
¶ 29. UMMC contends the circuit court improperly excluded expert testimony on the reliability of the autopsy report, but “[a] trial judge’s decision as to whether a witness is qualified to testify as an expert is given the widest possible discretion.” Id. at 145 (¶ 13). Well before trial, UMMC knew its own pathologists had concluded in Foster’s autopsy report that TTP was her cause of death. Instead of tendering an expert in the field of pathology to challenge the autopsy report, UMMC called two obstetrician-gynecologists (OB-GYN) — Dr. Martin and Dr. Sibai. In this case, the circuit court decided to limit Dr. Martin’s and Dr. Sibai’s testimonies regarding the autopsy report, since neither doctor was qualified to testify in the field of pathology. The Pounders opinion requires us to defer to the circuit court’s decision to limit their testimonies. Further, in a case with similar facts, our supreme court determined that the circuit *163 judge did not abuse his discretion by not allowing an OB-GYN to testify as to the cause of death. See Worthy v. McNair, 37 So.3d 609, 616-17 (¶¶ 21-26) (Miss.2010).
¶ 30. Additionally, the circuit court properly determined that the 2009 study[1] tendered by UMMC did not change the reliability of Foster’s postmortem TTP diagnosis. First, Dr. Charles Greenberg explained why the study’s results did not invalidate Foster’s autopsy report. Unlike Foster, the study’s subjects had no clinical signs of TTP before their deaths. Further, Dr. Greenberg testified that UMMC had no scientific basis to dispute the reliability of Foster’s ADAMTS13 test results; ADAMTS13 test results were part of the standard, accepted method of making a postmortem diagnosis of TTP. And Dr. Joel Moake admitted that his lab’s practice of refusing postmortem blood samples was not the accepted practice in the scientific community. Second, Foster’s tissue samples indicated the presence of microthrom-bi in Foster’s organs, a finding critical to a clinical diagnosis of TTP. None of the study’s subjects had mierothrombi in their tissue samples. Since the circuit court, sitting as the fact-finder, had substantial evidence to reject UMMC’s challenge to the sufficiency of the autopsy report, the judgment should be affirmed.
¶ 31. The circuit court’s opinion and order also points to evidence other than the autopsy report to support the finding that Foster had died from TTP. Shortly after Foster died, Dr. Martin, her treating physician, co-authored a journal article discussing Foster’s treatment at UMMC. In that article, Dr. Martin concluded that Foster had TTP, and her treatment should have been managed differently. It matters not that at trial, Dr. Martin changed his .opinion, as his article admitted that Foster had signs of TTP before her death. Dr. Greenberg also concluded that Foster had TTP. He based his opinion on the presence of certain inhibitory antibodies in Foster’s blood and the clinical signs of TTP reflected in her medical records. Finally, Dr. Robert Stern also testified that Foster had symptoms indicative of TTP. Because this evidence further supports the circuit court’s finding that Foster died from TTP, this Court should affirm the judgment.
¶ 32. Moreover, the complaint and the circuit court’s order and opinion reflect the Fosters’ allegation that UMMC also breached the standard of care for evaluating and treating hemolysis, elevated liver enzyme levels, and low-platelet-count syndrome (HELLP). -Specifically, the circuit court’s opinion and order states:
[ A]ll experts agree that plasma exchange therapy was the appropriate standard [of] care for the treatment of TTP and unrelenting HELLP patients whose symptoms fail to abate within 72 hours of deliver. [Foster]’s medical rec *164 ords attest to Defendant UMMC’s failure to aggressively monitor and treat what they mistaking[ly] believed was HELLP.
The record supports this finding. Dr. Stern testified that UMMC failed to admit Foster to the hospital on August 12th and monitor her condition. Dr. Stern and Dr. Greenberg both explained that the standard of care required UMMC to consult a hematologist after Foster’s treatment regimen for HELLP did not improve her condition. Dr. Greenberg added that UMMC should have initiated plasma-exchange therapy when Foster’s condition did not improve after she delivered her child. Substantial, credible evidence also supports the circuit court’s determination that UMMC’s negligent treatment for HELLP caused Foster’s death.
¶ 33. The evidence in this case belies UMMC’s claim that its own pathologists produced an unreliable autopsy report. And even without the autopsy report, the evidence still supports the circuit court’s finding that Foster died of TTP. Further, the circuit court did not abuse its discretion in limiting the testimonies of Dr. Martin and Dr. Sibai regarding the autopsy report, as they were not present during the autopsy and were not experts in the field of pathology. After reviewing the record, I find substantial, credible evidence to support the circuit court’s conclusion that UMMC’s breach of the standard of care for treating HELLP or TTP caused Foster’s death. Accordingly, I would affirm the judgment.
IRVING, P.J., JOINS THIS OPINION.

. The study compared postmortem tissue and postmortem blood samples from four subjects without TTP to a subject with TTP. The tissue samples were evaluated for the presence of microthrombi. The blood samples were evaluated for ADAMTS13 activity levels and ADAMTS13 inhibitor levels. The TTP tissue sample had microthrombi, a finding consistent with a clinical diagnosis of TTP. The non-TTP tissue samples did not have microthrom-bi. But some of the non-TTP blood samples were similar to the TTP blood sample. Therefore, the study concluded that "caution” should be used when testing postmortem blood to make a TTP diagnosis because the ADAMTS13 activity levels "may not” be valid. Importantly, the expert witnesses at trial explained that the study’s results would not invalidate Foster’s postmortem diagnosis of TTP. Unlike the non-TTP subjects, Foster had: (1) clinical signs of TTP before her death; (2) microthrombi present in her heart, lungs, kidneys, thyroid, and adrenal glands; and (3) levels of ADAMTS13 activity and ADAMTS13 inhibitor consistent with a diagnosis of TTP.