**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-CA-01194-COA**

| | |
|---|---|
| **LATRICE RENA ROGERS, INDIVIDUALLY AND D/B/A GODDESS LENGTHS HAIR SALON, LLC AND D/B/A GODDESS OF GREAT LENGTHS, LLC** | **APPELLANTS** |

**v.**

| | |
|---|---|
| **ADA GREEN** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2024 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | HIAWATHA NORTHINGTON II TERRIS CATON HARRIS |
| ATTORNEYS FOR APPELLEE: | S. MALCOLM O. HARRISON TIFFANY HORTON-WILLIAMS |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 04/28/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND WEDDLE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Ada Green sued Latrice Rogers, individually and doing business as Goddess Lengths Hair Salon LLC and Goddess of Great Lengths LLC (collectively, the Appellants), for invasion of privacy; specifically, Green claimed that the Appellants intentionally appropriated Green's image for commercial gain by taking photographs of Green and using those photographs to market the Appellants' hair products and hair salon.

¶2.     After a trial in the Hinds County Circuit Court, the jury returned a verdict in favor of

Green and awarded her compensatory damages. The Appellants filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a remittitur of the damages award. The trial court denied the JNOV motion but granted the request for remittitur and reduced Green's damages.

¶3. The Appellants now appeal, arguing that the trial court erred in denying the Appellants' motion for JNOV. The Appellants also take issue with the amount of the remittitur awarded by the trial court.

¶4. After our review, we find that Green failed to provide sufficient evidence establishing a prima facie case of invasion of privacy; accordingly, the jury's verdict was not supported by the evidence. We therefore reverse and render on this issue.

## FACTS

¶5. In approximately 2016, Rogers hired Green to work at Rogers's hair salon, Goddess of Great Lengths. Green's duties involved helping clients, fulfilling orders, and maintaining inventory. Green was hired as an independent contractor, and Rogers paid Green in cash.

¶6. During this same time period, Green also modeled the Appellants' hair products and participated in photo shoots while wearing the hair products. The photographs of Green were used on billboards, flyers, and vending machines for purposes of marketing the hair products. The Appellants maintain that Green's modeling photographs were taken in connection with her role as a brand ambassador for Goddess of Great Lengths. Green denies that she served as a brand ambassador, and she maintains that the photographs were taken as part of her job duties at the salon.

2

¶7.     Rogers terminated Green's employment in January 2021. In early 2022, Green sent the Appellants a cease and desist letter to stop using Green's likeness and image without Green's consent and without compensation. In the letter, Green claimed that the Appellants failed to obtain Green's consent to use her image, and Green demanded $500,000 to settle the matter.

¶8.     In February 2022, Green filed a lawsuit against the Appellants for invasion of privacy and alleged that the Appellants used Green's image without Green's consent for purposes of advertising the Appellants' hair products.[1]  Green sought economic, non-economic, and punitive damages.

¶9.     A jury trial was held in August 2024. At trial, Green testified that she never consented to the Appellants' use of her modeling photographs for marketing purposes. Green also testified that the Appellants never compensated her for their use of the photographs. Rogers testified, however, that Green gave the Appellants permission to use the photographs for marketing purposes. Rogers also testified that when Green modeled for the photographs, she was aware that the photographs would be used for marketing purposes and that Green even selected which photographs would go on billboards, flyers, and vending machines.

¶10.    The jury returned a verdict in favor of Green and awarded her compensatory damages for emotional distress in the amount of $150,000.

¶11.    The Appellants filed a motion for JNOV or, in the alternative, for a remittitur. After

---

[1] Green also alleged negligence and gross negligence in her complaint. At trial, the trial court granted the Appellants' motion for a directed verdict as to the negligence claims. On appeal, neither the Appellants nor Green asserts any assignments of error as to the negligence claims.

hearing arguments on the post-trial motion, the trial court denied the Appellants' request to enter a judgment in their favor or, alternatively, remitting the jury award to zero dollars. However, the trial court granted Rogers's request for remittitur to an amount of "nominal damages" and set the amount of "nominal damages" at $50,000.

¶12. This appeal followed.

## DISCUSSION

¶13. The Appellants first argue that the trial court erred by denying their motion for JNOV. The Appellants maintain that Green failed to meet her burden of producing sufficient evidence to establish her cause of action of invasion of privacy; as a result, the jury's verdict was not supported by the evidence.

¶14. A motion for JNOV "challenges the sufficiency of the evidence and asks whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Radco Fishing & Rental Tools Inc. v. Com. Res. Inc.*, 407 So. 3d 167, 189 (¶62) (Miss. 2025) (internal quotation mark omitted). We review de novo a trial court's grant or denial of a motion for JNOV. *Id*.

¶15. Green sued the Appellants for invasion of privacy; specifically, the appropriation of Green's likeness for a commercial purpose. "In order to prevail on a claim based on appropriation of one's likeness for commercial gain, [Green] must show that the [Appellants]: (1) appropriated [her] name or likeness, (2) without consent, (3) for use in a commercial enterprise." *Brasel v. Hair Co.*, 976 So. 2d 390, 392 (¶7) (Miss. Ct. App. 2008) (citing *Harbin v. Jennings*, 734 So. 2d 269, 272 (¶10) (Miss. Ct. App. 1999)). The record

is clear that the photographs at issue are of Green and that they were used in a commercial enterprise, namely, Rogers's business. Therefore, the main issue at trial and on appeal is whether Green consented to the Appellants' use of the photographs. The Appellants maintain that the jury's determination that the Appellants did not have consent to use Green's images or photographs is not supported by the evidence presented at trial. We agree.

¶16. At trial, the jury heard testimony from Rogers and Green, as well as Ken Marshall, the creative director for the Appellants, and Melanie Sanders, the owner of a public relations firm. Green's social media posts were also admitted into evidence. Rogers testified that from approximately 2016 through 2018, Green served as a brand ambassador for Goddess of Great Lengths. Rogers explained that a brand ambassador is essentially a model for a brand's products. Rogers described Green as the "face" of Goddess of Great Lengths, and Rogers testified that this role entailed Green modeling hair products for marketing photographs. The record reflects that Green modeled in two different photo shoots in Atlanta, one in 2016 and another in 2018. Rogers testified that she paid for the photo shoots and that she also paid for Green's travel to and from the photo shoots.

¶17. Relevant to the issue of consent, Rogers repeatedly testified that Green gave her permission to use Green's modeling photographs for marketing purposes. Rogers explained that she and Green had an "agreement" that Green herself would choose the specific photographs that she wanted to use for different promotional purposes, from flyers to vending machines to billboards. Rogers stressed that Green "asked specifically for these photos and knew exactly where they were going." Rogers testified that the photographs

5

served a dual purpose—to promote Green and also to market Goddess of Great Lengths. Rogers explained, "I have the platform and she took the pictures. So, I market for her. She markets for me." Rogers testified that Green never requested Rogers to take down the photographs or revoked her permission until Green sent the cease and desist letter in 2022.

¶18. Rogers testified that Green benefitted from the Appellants' use of the photographs "[b]ecause her pictures [were] everywhere[,] . . . [and she] would get jobs, [she] would get bookings, based on her experience, based on her being under my brand . . . ." During the time period at issue, Rogers was featured on a reality television show. Rogers testified that because Green worked for her, Green also made an appearance on the show. Rogers referenced Green's appearance on the television show as a way to demonstrate Green's benefitting from the photographs.

¶19. Regarding compensation, Rogers maintained that Green never approached her about receiving money for the Appellants' use of photographs of her to market their products. Rogers stated that as payment for modeling, Green received hair extensions and hair products, access to the photographs, and all-expenses-paid trips. Rogers explained that modeling for the marketing photographs "was, always, under the scope of [Green] being an ambassador. So anything monetary wise, is out the window. I offered her a form of payment in hair for that, unlimited hair, unlimited travel . . . . She received hair for photo shoots. She received trips for photo shoots."

¶20. When asked if she had any documentation to show that Green consented to the Appellants' using photographs of her for profit without any monetary compensation, Rogers

answered, "I have a text message of her sending me the photos that she wants to use. So, to me, that's consent enough. She never said, once, that she didn't want me to use the photo that she sent to me. She, actually, sent me the photo to use of her."

¶21. Green, however, testified that she never consented to the Appellants using any of the modeling photographs for business purposes and that she never signed any documents related to the photographs. Green acknowledged that she went to Atlanta in 2016 and in 2018 to model in photo shoots arranged by the Appellants. Green admitted that during the photo shoots, she was wearing the Appellants' hair extensions and promoting the hair products. Green also admitted that she knew the photographs were taken for purposes of promoting the Appellants' products. When asked why she participated in the photo shoots if she did not consent to having her photograph taken, Green answered, "Because I came to work and I was told that was what we were going to do." Green explained that she was instructed to model the Appellants' hair products and pose for photo shoots as part of her job duties at Goddess of Great Lengths. Green claimed that she had no say in where or when the photo shoots occurred, explaining, "I walked into work. I was told we were taking pictures. We were getting hair done. We were getting makeup done for her products to sell the hair."

¶22. Green testified that after the photo shoots, she would review the modeling photographs and tell the Appellants which ones she liked, but she denied having any say as to which photographs of her appeared on different marketing platforms. Green admitted that while she worked for the Appellants, she never objected to their use of her modeling photographs on billboards, flyers, and vending machines.

¶23.    Green also admitted that she took pictures of the Goddess of Great Lengths billboards, flyers, and vending machines featuring her modeling photographs and posted them on her personal social media accounts.  Green maintained that she did this as part of her job duties, explaining that she was required to promote Goddess of Great Lengths on her personal social media accounts.  Green testified that she only posted the photographs because Rogers instructed her to do so:

> I didn't have whatever say so to not put that up there or take that down because that's what I was told to do as a part of my job.  So, if I didn't put that up there, it was an issue.  It was a problem.  I was told to promote her products to whatever extent that I had to promote her products to sell her products, whatever I had to say, whatever I had to do, whatever I had to post.  I did what she told me to do.

Green testified that after Rogers terminated her employment in early 2021, Green kept the photographs on her social media page but removed any reference to Goddess of Great Lengths.

¶24.    At trial, several posts from Green's personal social media account were entered into evidence.  On the posts, Green shared photographs of herself modeling Goddess of Great Lengths products.  One of Green's posts contains a photograph of a Goddess of Great Lengths billboard featuring Green modeling hair extensions.  Green placed the following caption on the post: "For those of you whose been sleep stay sleep and I mean that in the most humble way . . . I went from being just a #walkingbillboard to an actual #billboard #3 and as a #model it's moments like this you wait for[.]"  Green used several hashtags at the end of the caption, including #brandambassador.  Another post from Green's Instagram account shows a different Goddess of Great Lengths billboard featuring Green, and Green

8

captioned the post: "I just want to beat the odds do numbers and remain humble . . . I'm NO longer just a #walkingbillboard I AM ACTUALLY ON IT." A third post contains a photograph of Green's daughter standing under a Goddess of Great Lengths billboard featuring Green, and Green captioned the post: "So today while with my #1 fan this happened and I couldn't be any happier and more proud of myself[.]" Green included the following hashtags at the end of the caption: #imodel #improudofme #iusetoprayfortimeslikethis #theface #thebrand.

¶25. Green acknowledged that she had "brand ambassador" listed next to her name on her Instagram profile. However, Green claimed that she originally placed that on her social media account in 2012 and just never changed it. Green maintained that despite the hashtag, she never considered herself a brand ambassador for Goddess of Great Lengths.

¶26. Green also admitted that she did not tell the Appellants that they could no longer use her image until she sent the cease and desist letter in January 2022. Green explained that she did not realize that the Appellants needed her consent to use the photographs for marketing purposes or that the Appellants should have compensated Green for the photographs until after her employment was terminated.

¶27. After Green's testimony, the Appellants moved for a directed verdict. Regarding Green's invasion-of-privacy claim, the Appellants argued that Green failed to produce sufficient evidence to establish that the photographs were taken and used for business purposes without her consent. The Appellants also argued that Green failed to present any evidence or testimony, other than her own, to show that she was harmed by the Appellants'

9

actions or to support an award of damages.

¶28. After hearing arguments from the parties, the trial court denied the Appellants' motion for a directed verdict as to Green's invasion-of-privacy claim. The trial court explained that the relevant factor at issue was whether Green consented to the photographs. The trial court found, after viewing the evidence in the light most favorable to Green, that Green had presented sufficient evidence as to the factor of consent. The trial court referenced Green's testimony that she modeled for the photographs because she was told to do so as part of her job and found that "it is questionable as to whether or not she gave her consent."

¶29. The jury then heard testimony from Marshall, the creative director for the Appellants, and Sanders, the owner of a public relations firm. Marshall testified that in his role as creative director, he works as Rogers's wardrobe stylist and provides operations and visual marketing services for Goddess of Great Lengths. Marshall testified that prior to 2016, he had worked with Green in her capacity as a model. He knew Green had struggled to find a job and that she was interested in modeling, so he introduced Green to Rogers. Marshall testified that Green and Rogers "bonded really well," explaining that "[t]hey both shared genuine ideas for the betterment of the company."

¶30. Marshall testified that he was present for one of the photo shoots that Green modeled in for Goddess of Great Lengths. According to Marshall, Green never expressed any reservations about having her photograph taken and never asked to be compensated for the photographs. Marshall testified that during the photo shoot, Green had "free range" and "could pose herself, do whatever she wanted to do, pick her photos[.]" Marshall testified that

10

Green selected which photographs of her would be used for marketing purposes, and he described her as "thrilled" that the photographs were going to be on billboards and vending machines related to Goddess of Great Lengths.

¶31.    Sanders testified that in 2015, she began working as the public relations and brand manager for Goddess of Great Lengths. Sanders testified that she met Green in 2016, and at that time, Green was the "face" of Goddess of Great Lengths and a brand ambassador. Sanders stated that when she started working for Goddess of Great Lengths, "our roster of models were paid in hair." Sanders testified that she had people approach her and ask to model for Goddess of Great Lengths, and Rogers instructed Sanders to let these people know that if they modeled, they would receive hair extensions.

¶32.    Sanders testified that she was present for Green's photo shoots in Atlanta. Sanders explained that the purpose of the photo shoots was to take brand photographs to use for marketing, including social media and billboards. Sanders testified that because Green was the face of Goddess of Great Lengths, Green "was able to pick her own pictures. And we were very careful about the pictures that we chose because we wanted her to be happy." Sanders opined that Green was smart to become a brand ambassador for Goddess of Great Lengths because that role "was a stepping stone and a magnificent platform[,]" plus Green was able to have her travel expenses paid for photo shoots and have access to all the photographs. Sanders testified that Green benefitted from her role as a brand ambassador because she received other modeling and hosting jobs as a result of her affiliation with Goddess of Great Lengths.

11

¶33.    After considering the testimony and evidence, the jury returned a verdict in favor of Green.  The jury's verdict reflects the jury found that the Appellants intentionally used Green's likeness or photographs for business purposes without Green's permission.  The Appellants filed a motion for JNOV or, in the alternative, for a remittitur.  The trial court denied the Appellants' motion for JNOV but granted their request for remittitur to $50,000.[2]

¶34.    When reviewing a trial court's denial of a motion for JNOV, we will affirm "if there is substantial evidence to support the verdict." *Kirk v. Newton*, 380 So. 3d 252, 263 (¶26) (Miss. Ct. App. 2023) (citing *InTown Lessee Assocs. LLC v. Howard*, 67 So. 3d 711, 718 (¶22) (Miss. 2011)).  "In making this determination, the appellate court is to 'consider the evidence in the light most favorable to the appellee, giving the party the benefit of all favorable inferences that may be reasonably drawn from the evidence.'" *Id.*  However, "[i]f the facts so considered point so overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a contrary verdict, we are required to reverse and render." *3M Co. v. Johnson*, 895 So. 2d 151, 166 (¶46) (Miss. 2005).  Additionally, "when the plaintiffs fail to establish a prima facie case showing the elements of the cause of action, the entry of a judgment notwithstanding the verdict is proper." *Id*.

---

[2] While we are not reaching the issues of damages, we note that during the jury instruction conference, the Appellants objected to a proposed jury instruction on damages and argued that Green failed to present any evidence to support an award of damages for lost earnings, medical expenses, costs related to the loss of Green's property and business, if any, and property damage.  The trial court agreed and amended the jury instruction to allow the jury the option to award Green damages only for "All pain, suffering and mental anguish, past and future, sustained by [Green] as a result of the injuries, if any, which she sustained." Upon review, we find that Green provided no evidence at trial as to the value of her alleged emotional distress or any other aspect of her damages.

¶35. After considering the evidence and viewing it in the light most favorable to Green, giving her the benefit of all favorable inferences that may be reasonably drawn from the evidence, we find that Green failed to present sufficient evidence to establish a prima facie case of invasion of privacy based on appropriation of Green's likeness for commercial gain. As stated, in order to prevail on her claim, Green had to show that the Appellants appropriated Green's name or likeness *without consent* for use in a commercial enterprise. *Brasel*, 976 So. 2d at 392 (¶7). The evidence presented at trial showed that Green consented to the Appellants' use of her modeling photographs to promote their products; therefore, Green failed to meet her burden of proof as to the element of consent. The testimony showed that Green willingly participated in photo shoots while modeling the Appellants' hair products, and she understood that these photographs would be used for a commercial purpose related to the Appellants' business. Green reviewed the modeling photographs and told the Appellants which ones she liked. Green admitted that she never objected to the Appellants' use of the photographs on billboards, flyers, or vending machines to promote their hair products and that she did not ask the Appellants to take her images down until she sent the cease and desist letter in 2022, approximately six years after the first photo shoot. Green's social media posts showed that Green took pictures of the Goddess of Great Lengths billboards, flyers, and vending machines featuring her modeling photographs and posted them on her personal social media accounts. Green admitted that seeing herself pictured on billboards, flyers, and vending machines advertising the Appellants' products made her feel happy and proud.

13

¶36. Because Green failed to present sufficient evidence to establish a prima facie case of invasion of privacy, we find that the trial court erred in denying the Appellants' motion for JNOV on that claim. We therefore reverse the trial court's order denying the Appellants' motion for JNOV and render judgment on this issue in favor of the Appellants. Because this one issue is dispositive, we do not address the Appellants' remaining assignments of error.

¶37. **REVERSED AND RENDERED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McCARTY, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**