# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00684-COA

**DAVID L. KIRK AND I. B. LOGISTICS, INC.**                    APPELLANTS

**v.**

**ASHLEY NICOLE NEWTON**                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2020 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | KEITH D. OBERT |
| | WILLIAM F. BROWN |
| | GEORGE MARTIN STREET JR. |
| | ROBERT S. MINK |
| ATTORNEYS FOR APPELLEE: | JAMES W. NOBLES JR. |
| | EDWARD BLACKMON |
| | BRADFORD JEROME BLACKMON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 04/04/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Ashley Newton filed a complaint against David Kirk and I.B. Logistics Inc. for injuries she sustained in a collision between her vehicle and a trailer being pulled by Kirk and owned by I.B. Logistics. After both sides presented evidence concerning competing contentions as to the other being at fault for the collision, a Hinds County Circuit Court jury returned a verdict for Newton in the amount of $1,759,094.30 for compensatory economic damages and $1,000,000.00 for non-economic damages, for total damages in the amount of

$2,759,094.32. Kirk and I.B. Logistics appeal, arguing they are entitled to judgment as a matter of law or a new trial. They contend the jury's verdict is not supported by substantial evidence, was against the overwhelming weight of the evidence, or was the product of bias, passion, or prejudice. Additionally, they claim that they are entitled to a new trial because Newton's damages experts allegedly used improper data and methodology to calculate her wage-earning capacity and the amount of future lost wages that she would incur and because Newton mentioned her lack of insurance in front of the jury. After review, we find no error that necessitates reversal of the jury's verdict and affirm.

**FACTS**

¶2. On August 22, 2017, at a point on U.S. Highway 49 approximately 0.6 of a mile north of its intersection with Castle Chapel Road, Newton was seriously and permanently injured as a result of an automobile accident. The accident occurred between the 2006 Nissan Altima automobile Newton was driving and a Big Tex automobile-hauler trailer being towed behind a 2015 Dodge 3500 Ram Truck owned by I.B. Logistics and driven by Kirk. The Mississippi Highway Patrol and the Yazoo County Sheriff's Office investigated the accident and assisted at the accident scene. Newton was airlifted from the scene to the University of Mississippi Medical Center in Jackson, where she underwent numerous surgeries.

¶3. In October 2017, Newton filed a complaint against Kirk and I.B. Logistics (hereafter, at times, collectively referred to as Kirk) alleging that "Kirk, suddenly, without any signal or warning" caused the "truck and trailer" he was driving to drift over and "into her lane in front of her causing the front of her automobile to strike the rear of the Big Tex car hauler

2

trailer." She alleged that as a result of Kirk's negligence, she suffered a fractured cervical vertebra in two places, a fractured right hip and right knee at the patella, compound fractures of the tibia and fibula, a fractured right foot and ankle, and fractures of her sternum. Newton alleged in her complaint that those injuries caused her to incur medical expenses that totaled at least $240,000.00 and added that medical expenses were still ongoing. Newton also alleged in her complaint that at the time of the collision, she was pregnant with an unborn child and that as a result of the "trauma sustained," the unborn child died. She included a wrongful-death claim on behalf of the child and claimed damages for the child and the $2,500.00 dollars in medical bills to remove the deceased child from her body.[1]

¶4.     Kirk and I.B. Logistics filed separate answers in response to the complaint but were represented by the same attorney. They both denied liability for causing the accident and alleged that Newton "was negligent in failing to exercise reasonable care" and that her negligence "was the sole proximate cause of all injuries and damages sustained as a result of the collision."

¶5.     A trial was held in September 2020. Newton called a total of eight witnesses to testify about the accident and her damages. The first witness was Deputy Edward Ferrell. Deputy Ferrell testified that he was employed with the Yazoo County Sheriff's Office and responded to the accident scene. Deputy Ferrell noticed the compound fracture of Newton's lower leg and said that she appeared to be in severe pain. He also ensured the scene was cleared of other vehicles to allow a life-flight helicopter enough area to land. Deputy Ferrell testified

---

[1] The court entered an agreed order of partial summary judgment on all claims and damages relating to the wrongful-death claim for the unborn child.

3

he saw "skid marks" in both the right-hand lane and the left-hand lane. He stated, "[The marks] started in the right lane and came to rest where the car was across both lanes." He emphasized again that the skid marks "started in the right lane." He added the truck and trailer were about "a quarter of a mile" down the road from where Newton's vehicle came to rest. Finally, Deputy Ferrell admitted on cross-examination that he did observe a garbage can on the "right-hand shoulder of the road."

¶6.     Kirk, the driver of the truck and trailer testified twice in the trial. First, he was called as an "adverse" witness by Newton. During that testimony Kirk testified at the time of the accident he was working for I.B. Logistics as a driver who transported automobiles. On the day of the accident, he had dropped off an automobile in Cleveland, Mississippi, and he first indicated he was on his way to his home but then admitted he was on his way to Jackson. He was on Highway 49 when the accident occurred. Kirk indicated he and Newton were both in the left-hand lane when the accident happened and he had seen her seconds before the accident when he looked in his rearview mirror.[2] Kirk testified that he noticed a garbage can in the road, slowed down to about "30, 35" miles per hour and Newton "swerved to the right" and struck the rear right side of his trailer. Kirk and Newton provided very different

---

[2] Apparently, Kirk's answers were very different from his prior under-oath testimony about seeing Newton prior to the accident. Newton's attorney questioned Kirk in front of the jury on these new answers. In his under-oath deposition taken before trial, Kirk had admitted that he did not see Newton before the accident, did not know which lane she was in prior to the accident, and had not looked in the rearview mirror. Kirk attempted to explain his trial testimony being inconsistent with his deposition testimony: "I just didn't understand what he had said as the time." Whether that is an inconsistency in his testimony and whether it should or should not affect his credibility was for the jury to decide. *See Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

versions of exactly what happened to the jury. Also, they each called other witnesses to bolster their version.

¶7.    Newton testified that she was in the right-hand lane from the red light she stopped at before the accident. Newton testified that she proceeded down the road after the red light and stayed in right-hand lane the entire time until Kirk pulled over into her lane causing her to strike the rear of his vehicle. She testified she never saw the brake lights or a turn signal activate on the trailer Kirk was towing prior to the accident to indicate he was going to come from the left-hand lane into the right-hand lane. She described the wreck as follows:

> On the way work going down 49 he passed me. When he passed me -- I'm sure he didn't see me, but **when he passed me he jumped over in my lane**. It happened so quick. I was trying to go to the left. But when I went to the left I hit the back of his trailer. We stopped. I guess when he felt the hit, he stopped. And when he stopped he jumped out of his truck went to the back of the truck, and I thought he was fixing to leave because when he went to the back of his truck he was connecting something or fixing something, hooking something back up. So he jumped back in the truck and pulled the truck all the way down the highway.[3]

Newton explained that Kirk was "halfway" in her lane and that she only left her lane of travel "when I turned to try to miss" him.

¶8.    Newton described her injuries at trial. She testified she fractured numerous places in

---

[3] Kirk alleges Newton "provided at least two other accounts of what happened." He recounts that the officer's amended report stated that Newton had told him the trailer became "disconnected" causing her to collide with it. However, during trial, Newton testified that she was too injured to speak with the officer at the scene, and once she saw that he had a report without her version of the wreck, she called him. She testified that she actually told the officer "once the collision happened he jumped out of his truck fixing something as if something had detached from the truck and trailer. That's what I said." She indicated the officer simply got her statement wrong. Whether that is or is not an inconsistency in her testimony and whether it should or should not affect her credibility was for the jury to decide. *See Little*, 233 So. 3d at 289 (¶1).

her body including, her right femur bone, her right hip, her right knee, the bones in her lower right leg and her right ankle, and her sternum.

¶9. Newton then called Corey Freeman, a Yazoo County deputy sheriff at the time of the wreck, to the stand to testify. While waiting for the ambulance to arrive, Deputy Freeman attempted to calm Newton by preventing her from seeing her injuries. Once the ambulance arrived, it was determined that she needed to be airlifted to the University of Mississippi Medical Center in Jackson, Mississippi.

¶10. Newton played Dr. Matthew Graves's deposition for the jury. Dr. Graves testified that he reviewed Newton's "records from University of Mississippi Medical Center beginning on August 22, 2017 and continuing until January 10, 2018." He stated Newton had sustained severe injuries resulting from the accident and he had conducted "an orthopaedic and neurologic exam of her lower extremities." Based on his review of Newton's medical history and examination of her accident-related injuries, he concluded that "[s]he's los[t] 71 percent of the use of her right leg" which was a loss of 28% to the body as a whole in permanent impairment. He also testified that Newton

> will most likely need a repeat total knee arthroplasty and each time she has surgery she will need approximately 36 sessions of physical therapy after each surgery. She will also need Opioids postoperatively . . . two blood tests, a CBC and a comprehensive metabolic panel annually at least once a year for the rest of her life. She needs equipment to include but not limited to custom shoes, a cane, support stockings, a transfer tub bench and safety bars in her bathroom, and she will need eight to sixteen hours of assist for the rest of her life.

He also testified that based on his "knowledge, training and experience in the field of physical medicine and rehabilitation," Newton would not be able to go back to performing

6

the work she did prior to the injuries, home healthcare nursing, and Newton "can do sedentary work. That's the only thing she can do. She's limited to sedentary activities."

¶11. Newton then called Dr. Howard Tuck Katz, an expert in physical medicine and rehabilitation, to the stand. Dr. Katz performed an independent medical examination on Newton. Based on the physical examination of Newton and the medical records, Dr. Katz determined that the car wreck caused an ankle fracture, multiple femur fractures, a meniscus tear, and a sternal fracture. Newton required surgeries on her ankle, knee, and hip. Dr. Katz used the Guides to the Evaluation of Permanent Impairment to determine that Newton lost 71% of the use of her right leg. Dr. Katz also gave his opinion on her future medical needs. Newton will need "a home exercise program" and medications for her hip and ankles. She will also need "aquatic therapy and an aquatic exercise program." Furthermore, she will likely need a total knee replacement and an MRI of her knee approximately every two years. Lastly, "she needs approximately eight hours of assistance per week for housekeeping, homemaking[,] and heavy lifting."

¶12. Newton also called Elizabeth Martina, a certified rehabilitative counselor and life-care planner. She was accepted as an expert witness in the field of life-care planning and vocational rehabilitation assessment. Kirk objected to Martina's testimony because there was "no evidence before the court of her qualifications." Also, Kirk argued that Martina used a statistical wage average to develop pre-accident wage earning capacity and "ignored the historical wages" of Newton. Newton's attorney responded that the average wage of $37,400.00 opined by Martina is supported by the wages she was making at the actual job

7

she was working at the time of the accident. He explained that Newton started as an LPN at Stay Home Health Care Services as a LPN in May of 2017, just a few months before the accident. Between May and August, the day of the accident, Newton was actively working as an LPN making approximately $17.50 per hour, which equals $36,000.00 a year. The court overruled Kirk's objection and allowed Martina to testify as an expert in life care planning and vocational rehabilitation.

¶13.    Martina testified that she assessed Newton's ability to earn wages after the accident to determine if she could return to work and also what kind of jobs she could do. Martina explained she was asked to perform a "vocational assessment" and a "life care planning assessment." Martina conducted an evaluation of Newton and reviewed medical records, entry records, and depositions and had "conferences" with treating physicians. Martina testified that Newton could not do any job in the future as a home healthcare nurse due to restrictions of standing and lifting. Martina opined Newton was limited to "sedentary jobs" that could restrict her pay to $7.91 to $10.02 per hour. In 2016, Newton made $17,605.00 as an LPN.[4]

¶14.    Martina also determined Newton's potential future medical care costs. Martina testified based on Newton's doctors' recommendations, that she will likely need two knee replacement surgeries and ankle fusions due to her long life expectancy. She testified to the cost of each of these future surgeries. She testified that she determined future medical costs

---

[4] On cross-examination, Kirk's attorney emphasized that Martina failed to properly analyze Newton's future lost wages and her past employment. During the cross-examination Martina clearly stated "saying that I didn't take into account her historical wages is incorrect."

to be between to $784,229.00 which included the cost of the surgeries: an "orthopaedic followup post ankle fusion," "orthopaedic post-op additional foot fusion," "a right ankle CT," "right ankle x-rays," "right foot x-rays," "right knee MRI," "physical therapy," "post-operative medication," and "a right knee replacement."

¶15.   Newton also tendered James Koerber, an expert in the field of economics.  Kirk's counsel made an objection as to Koerber's methodology in determining Newton's damages.[5] Kirk's counsel explained that "Koerber relied upon incorrect facts and data" and "object[ed] to him as a witness on that basis."  The objection centered on Koerber using the national wage averages for LPNs, $35,145.00, instead of using the amount that Newton actually made in 2016, the year before the accident of $17,605.00.  The court overruled the objection and accepted Koerber as an expert in the field of economics finding Koerber qualified under Mississippi Rule of Evidence 702.  Koerber testified that he relied on Martina's report regarding Newton's earning capacity but "did [his] due diligence to analyze."  He stated that Martina's report concluded an average wage of $35,145.00, but his individual evaluation concluded higher amounts, $38,533.00 and $36,400.00.  Koerber explained that he looked at the earnings that Newton "was actually making" at the time of the accident in 2017 at Stay Home.  Although Newton only worked at Stay Home between May and August of 2017, Koerber used what she was actually making during that time frame and determined her salary for an entire year.  That amounted to $38,533.00.[6]  Koerber also remarked that he used

---

[5] Kirk's counsel made the same objection as to Martina's testimony.

[6] Based on Newton's first day of employment at Stay Home, May 1, 2015, Newton "had worked 15 periods and made around $11,000.00.  That worked out to $741.00 per

9

another method to determine Newton's actual wage earnings for 2016, and that calculation yielded a figure of $36,400.00.00.[7] Koerber emphasized that the national average Martina used was less than both annualized actual wage-earning figures he determined. This, he claimed, "showed that what Martina came up with was a reasonable calculation."

¶16. Koerber also testified that Newton's total lost wages, future and past, reduced to present value was $1,170,958.00.[8] He testified past lost wages amounted to $78,762.00, which was calculated from the time of the accident to the date of his report, and explained future loss of earnings damages amounted to $1,092,196.00 for the total of $1,170,958.00. Koerber also testified the mitigated future lost wages were $604,121.00.[9]

¶17. Trooper Calvin Jones was called by the defense. Trooper Jones testified he was a deputy for the MHP and responded to the scene of the accident. He indicated he did investigate the accident and prepared two written reports. The first was prepared as a result of his on-scene investigation. The record indicated that the report included a statement from Newton. Trooper Jones indicated Kirk told him he was "slowing to avoid a can in the road" and was "rear-ended" by Newton. He testified that he did not speak with Newton at the

---

week, [and annualized to] $38,533.00."

[7] This was based on Newton's Stay Home flat salary of $17.50 an hour, multiplied by 2,080 hours.

[8] Koerber stated this amount "take[s] in account what Newton was actually earning at the time of her accident, less taxes, payroll and income, adding fringe benefits and reducing it to present value over the work life."

[9] Mitigated future lost wages assumed Newton returned to work in some capacity in the future.

10

scene because she was "being extricated" out of the vehicle and "being taken care of by EMS." He testified he did speak to Newton "some days after the accident" when she "called" him. Trooper Jones indicated that Newton told him "she was passed by" Kirk, the trailer disconnected from the truck, and the driver got out after the accident and "reconnected" it. Trooper Jones testified Newton said she struck the trailer because it became disconnected.[10] Finally, Trooper Jones admitted he did see a garbage can, but it was on the side of the road off the right-hand lane.

¶18. Kirk also called Bruce Brawner to testify as an expert in vocational rehabilitation counseling and life-care planning. Brawner testified as to Newton's employability in light of the August 22, 2017 incident. Brawner explained the purpose of his evaluation was "to determine the skills demonstrated through [Newton's] past work and also the aptitudes demonstrated through [her] past work." Brawner reviewed Newton's education history and post-accident work history to determine the type of work Newton would be able to perform after the accident. Brawner admitted that Newton would not be able to perform her "past work as an LPN or a certified nursing assistant." Brawner stated that Newton would be limited to sedentary work. Specifically he stated,

> The only two jobs, as I mentioned earlier that were sedentary that she's held, one is the check cashier job, she can still do that, and the job as a deputy clerk. She can still do that. But that doesn't mean that those are the only jobs at the sedentary level that she can do, but of her past jobs she can do those.

¶19. Brawner concluded that Newton could perform other sedentary work such as cashier,

---

[10] Newton denied that she made this statement or that it was quoted at the accident. *See supra* note 3.

insurance clerk, 911 dispatcher, customer service representative. Brawner also testified that Newton's post-incident earning capacity was approximately $25,605.00 a year. Finally, Brawner testified that he disagreed with the way Newton's expert, Martina, measured Newton's post-accident wage earning capacity. He explained that "you cannot discount past earnings," and based on Newton's tax return and historical earnings, the most Newton had ever earned was $17,605.00 annually.

¶20.    Kirk also called Dr. Gerald Lee, an expert in economics. Dr. Lee relied on Brawner's report to determine the monetary value or costs of Newton's life-care plan. Brawner's report had a high-cost and low-cost plan. The low-cost plan "had a total cost of $150,426.00. That has a present value of $105,513.00. The high-cost [plan] had a total future cost of $169,229.00; reduced to present value that's $188,702." Dr. Lee calculated the net present value of Newton's wages by multiplying her "earnings for the year 2016[,] which was the last complete year prior to the accident," by the "amount of time she was totally disabled." This totaled $17,605.00. He then "added 7.65 percent of the fringe benefit" of $2,424.00, arriving at an after-tax income of $34,113.00. Dr. Lee's figures as to future lost wages were based on Newton's actual income earned in 2016 and the few months she was working in 2017. He did not annualize the 2017 salary into a full year salary, and he did not use a national average wage for an LPN.

¶21.    Finally, Dr. Preston Scarber Jr.—an expert in accident reconstruction—testified that he conducted a reconstruction study of the accident. He testified that he went to the scene of the accident, obtained drone footage of the site, inspected both vehicles, and reviewed

12

photographs that were taken after the accident occurred. According to Dr. Scarber, he did not find any evidence in the right lane, and he initially hypothesized that the accident most likely occurred in the left lane.

¶22. Dr. Scarber explained that he had certain "targets" to match in reconstructing the accident: (1) the Nissan's crush effect, (2) the Nissan's final resting position, (3) the Nissan's orientation, (4) the trailer's damage, and (5) the hypothetical point of impact—the left lane. According to Dr. Scarber, a simulation was considered 75% reliable if it met three targets. He testified that the simulation in this case—showing that the impact occurred in the left lane—met all five targets. Therefore, he believed that Kirk's testimony that the wreck occurred in the left lane was the "most likely" scenario for how the accident occurred. He further testified that in order to meet all five targets, the accident could have only occurred in the left lane.

¶23. Dr. Scarber testified that he also created a simulation using Newton's testimony as to how the accident occurred. That simulation, however, did not meet all five targets. Additionally, Dr. Scarber testified that the device that attached the trailer to the truck was bent approximately 45 degrees. According to Dr. Scarber, it had to have been attached to the truck at the time of the accident for that to occur.

¶24. After jury instructions and closing arguments, the jury returned a written questionnaire verdict finding Kirk 100% at fault for the accident and determined damages as follows:

| | |
|---|---|
| Past Medical expenses: | $292,582.32 |
| Past lost wages: | $78,762.00 |
| Future medical expenses | $784,229.00 |
| Future lost wages: | $604,121.00 |

| Non-economic damages: | $1,000,000.00 |
| Total: | $2,759,094.32 |

Kirk filed and motion for judgment notwithstanding the verdict or new trial or in the alternative, remittitur. The trial court denied the post-trial motions. Kirk appeals and raises four issues.

## ANALYSIS

**1.     Whether the trial court erred in overruling Kirk's motion for a JNOV because the evidence was insufficient to support the jury's verdict.**

¶25.    Kirk alleges on appeal that Newton did not meet her burden to establish that his negligence caused the collision. Specifically, Kirk contends the jury's verdict was not supported by "substantial evidence." Kirk's appellant's brief concludes "[T]he Trial Court should have granted Defendants' Motion for Judgment Notwithstanding the Verdict."

¶26.    "The standard of review for the grant or denial of a motion for a JNOV is de novo." *Wilty v. Alpha*, 99 So. 3d 830, 833-34 (¶18) (Miss. Ct. App. 2012) (citing *InTown Lessee Assocs. LLC v. Howard*, 67 So. 3d 711, 718 (¶22) (Miss. 2011)). "A motion for JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of a JNOV [motion] if there is substantial evidence to support the verdict." *InTown Lessee*, 67 So. 3d at 718 (¶22). In making this determination, the appellate court is to "consider the evidence in the light most favorable to the appellee, giving the party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id.* When presented with a motion for a JNOV, both the trial court and the appellate court face "the same question—whether the evidence, as applied to the elements of a party's case, is either so

14

indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Id.*

¶27. This Court and the Mississippi Supreme Court have held the following so many times that it has assumed the status of an axiomatic legal principle**:** when the evidence is conflicting, the jury determines the facts in disputes and is the "sole judge of the credibility of witnesses and the weight and worth of their testimony." *E.g., Solanki v. Ervin*, 21 So. 3d 552, 568 (¶41) (Miss. 2009) (citing *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)). Further, the jury also determines "the weight and credibility of witness testimony." *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (¶19) (Miss. 2010); *see also Stuart v. St. Dominic-Jackson Mem'l Hosp.*, 311 So. 3d 1192, 1204 (¶60) (Miss. Ct. App. 2020). As an appellate court, "we do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little*, 233 So. 3d at 289 (¶1).

¶28. Here, Newton testified the accident occurred when the trailer Kirk was driving came into the lane she was traveling in as it passed her. She reacted, and the front of her vehicle struck the back of the trailer. Kirk testified he was in the left-hand lane with Newton behind him when she struck the trailer. Both parties offered testimony that supported their versions of how the accident occurred.

¶29. The Mississippi Supreme Court examined a similar issue in *Solanki*. Following a car accident, the jury found in favor of the defendants, and the plaintiffs appealed, arguing, among other claims, that the evidence was insufficient to support the verdict and that the jury was prejudiced against them. *Solanki*, 21 So. 3d at 567-68 (¶40). The Mississippi Supreme

Court held:

> **The jury heard all the evidence presented.** The jury ultimately found that Ervin was not negligent and that Defendants, therefore, were not liable to the Solankis. **The jury determines the weight and credibility of witnesses**. *See, e.g.*, *Nelson v. State*, 10 So. 3d 898, 913 (Miss. 2009) (citing *Moore v. State*, 933 So. 2d 910, 922 (Miss. 2006)) ("The jury determines the weight and credibility of witness testimony."); *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980) (**"This Court has in numerous cases, too many to mention, said that when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony."**). This Court finds that the testimony of Ervin and Messerschmidt is legally sufficient to support the jury verdict.

*Id.* at 568 (¶41) (emphasis added).

¶30. Kirk responds that the only accident reconstructionist who testified opined that the accident happened how he says it occurred and even offered a reconstruction simulation as support. Dr. Scarber certainly provided relevant testimony but ultimately it was up to the jury to accept or reject his testimony. In *Hollingsworth v. Bovaird Supply Co.*, 465 So. 2d 311 (Miss. 1985), the Mississippi Supreme Court authorized accident-reconstruction expert testimony. *Id.* at 313. The supreme court made clear that "prior to today's decision, this Court has stood firmly behind the rule which prohibits an accident reconstruction expert from giving his opinion on how an accident happened, the point of impact, the angle of travel, the responsibility of the parties involved or the interpretation of photographs." *Id.* at 314. The supreme court reasoned, "An expert's qualifications and the basis of his conclusions are open to cross-examination. The jury, as is their province, may reject the expert's testimony just as they might any other witness." *Id.* The supreme court overruled prior precedent prohibiting accident reconstruction experts from testifying but instructed that "the jury

16

remains the ultimate finder of fact." *Id.* at 315. It is clear that it is for the jury to determine how much weight and worth an expert's testimony deserves. A party cannot hire an expert and expect his or her testimony to supplant the fact-finding role of the jury. Kirk's contention that Dr. Scarber's testimony proved that Newton was negligent and the jury's verdict should be overturned is misplaced. The evidence presented at trial showed differing testimony as to fault. Dr. Scarber's testimony was one opinion and one source of evidence among many for the jury to consider. Kirk's contention is an argument for the jury at trial. That argument was indeed made at trial, and the jury rejected it after being instructed on the law by the trial court.

¶31. "This Court presumes that jurors have followed the instructions of the court, because to presume otherwise would render the judicial system inoperable." *Evans v. State*, 226 So. 3d 1, 26 (¶60) (Miss. 2017); *see also Young v. Guild*, 7 So. 3d 251, 263 (¶39) (Miss. 2009); *Aday-Cazorla v. State*, 309 So. 3d 1169, 1174 (¶13) (Miss. Ct. App. 2021). In this case, no one contends on appeal that the jury was not legally and adequately instructed. Some of the relevant portions of the jury instructions are helpful:

1.   It is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose.
2.   Both the Plaintiffs and the Defendants have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case.
3.   You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. . . . After making your own judgment, you will give the testimony of each witness such credibility, if any, as you think it deserves.
4.   If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that a reason given in support of the opinion is not sound, or that the

17

opinions are outweighed by other evidence, then you may disregard the opinion entirely.

¶32.   "To be clear, . . . neither the Supreme Court nor the Court of Appeals 'sits as thirteenth juror.' We do not make independent resolutions of conflicting evidence. Nor do we re-weigh the evidence or make witness-credibility determinations." *S. Cent. Reg'l Med. Ctr. v. Regan*, 303 So. 3d 432, 444 (¶23) (Miss. Ct. App. 2020) (citing *Little*, 233 So. 3d at 292 (¶20)). Newton gave one version of how the accident happened, and Kirk gave another. The jury sorted the evidence, judged the credibility of the witnesses, and made a factual determination that Kirk was at fault for this accident. Newton testified Kirk pulled over in her lane of travel and that she attempted to avoid hitting the trailer but struck the back of it, there was damage to the back of the trailer, and there were skids marks in the lane. She testified she was traveling in the right-hand lane when she started her efforts to avoid an accident; and there was corresponding damage to the front of her vehicle. Viewing the evidence in a light "most favorable" to Newton and giving her "the benefit of all favorable inferences that may be reasonably drawn from the evidence" it appears there is substantial evidence in the record to support the jury's determination of fault. This Court must follow legal precedent and not sit as the thirteenth juror. We will not substitute our own opinion for the jury's opinion concerning the conflicting evidence presented by the parties to this lawsuit. This issue is without merit.

> **2.   Whether a new trial is warranted because the verdict was against the overwhelming weight of the evidence or was the product of bias, passion, and prejudice.**

¶33.   Kirk and I.B. Logistics claim that the circuit court erred by denying their motion for

18

a new trial because of the weight of the evidence. Further, they claim that a new trial should have been ordered because potential jurors' responses to questions during voir dire indicated they were biased or prejudiced against truck drivers.

¶34. "A trial judge may order a new trial if 'the verdict is against the overwhelming weight of the evidence.'" *Brewer v. Bush*, 350 So. 3d 1133, 1139 (¶10) (Miss. Ct. App. 2022) (quoting *Bobby Kitchens Inc. v. Miss. Ins. Guar. Ass'n*, 560 So. 2d 129, 132 (Miss. 1989)). "A motion for a new trial is addressed to the discretion of the trial judge." *Id*. (citing *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶18) (Miss. 2000)). "However, that discretion 'should be exercised with great caution' and 'invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *Id*. (quoting *Amiker*, 796 So. 2d at 947 (¶18)).

¶35. When we review the denial of a motion for a new trial, we afford the trial court "substantial deference to its determination on the weight of the evidence issue and whether to grant a new trial." *Id*. at (¶11). We will only reverse "when such denial amounts to an abuse of that judge's discretion." *Id*. (quoting *Weber v. Est. of Hill*, 335 So. 3d 1030, 1038 (¶35) (Miss. 2021)). Additionally, we give "great deference to the jury verdict itself." *Id*. at (¶12) (quoting *Weber*, 335 So. 3d at 1038 (¶36)). "A new trial may be granted where the verdict is against the overwhelming weight of the evidence" or "when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice." *Phillips 66 Co. v. Lofton*, 94 So. 3d 1051, 1070 (¶58) (Miss. 2012) (quoting *Coho Res. Inc. v. Chapman*, 913 So. 2d 899, 908 (¶28) (Miss. 2005)). Our role as appellate court is to view the evidence in

19

the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 289 (¶1). Reversal is only proper when this Court is convinced that the trial court has abused its discretion in failing to grant a new trial. Thus, the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict. *Winding v. State*, 908 So. 2d 163, 167 (¶18) (Miss. Ct. App. 2005) (citing *Cousar v. State*, 855 So. 2d 993, 998 (¶15) (Miss. 2003)).

¶36. The jury heard from over twelve witnesses during this trial. They saw numerous photographs of the accident immediately after the accident. They heard from Yazoo County deputies and Mississippi Highway Patrol officers as to what they saw and heard once on scene and what their investigations indicated as to the accident. They heard from an accident reconstruction expert who provided accident reconstruction simulations. Finally, they heard the competing evidence offered by each participant in the accident. The jury did what the court instructed them to do. Listen to the evidence, give each witnesses' testimony the credit and weight they think that testimony deserved, follow the law provided by the court in the form of jury instructions and return a verdict after resolving the factual disputes. There is absolutely nothing in the record to indicate the jury did not do each of the aforementioned tasks. Since there was substantial evidence in the record to contradict Kirk's version of the accident and support Newton's, this Court is bound by precedent to conclude the trial court did not abuse its discretion in denying the motion for a new trial.

¶37. Kirk also argues the verdict was the result of bias, passion, or prejudice and should

be set aside on that basis. Kirk asserts that comments made by individuals on the venire demonstrated prejudice toward truck drivers and improperly caused bias and prejudice. Kirk points to an exchange during voir dire which he alleges proves his point.

¶38. During voir dire, the following exchanges occurred between Kirk's counsel Mink and potential jurors:

**Potential Juror Allen**

MINK:    Raise your hand if you believe that in a situation in which there is a passenger vehicle involved and a commercial vehicle involved, that there is a greater duty on the part of the commercial driver to avoid the accident? Understand? Okay. Yes, sir. You are?

ALLEN:    Walter Allen, panel 5/11. . . . As a CDL operator I think there is a higher responsibility for commercial drivers in general.

. . . .

**Potential Jurors Speaks and Anderson**

MINK:    Did everyone hear that? Did everyone hear Mr. Allen's statement? . . . Does anyone else have that belief?

SPEAKS:    I don't know if it's the same belief, but I believe -- Clyde Speaks, panel 6. I believe commercial vehicles really need their own -- they need their own highway. I don't think commercial vehicles and passenger vehicles need to be on the same highway. And I know eventually we probably will get to that, but I know that's some years away. But I think 18-wheelers need their own – they need their own highway. I really do.

. . . .

MINK:    All right. Mr. Speaks says that he believes that commercial vehicles ought to have separate roads from passenger vehicles. Am I stating it correctly?

SPEAKS:    Yes.

MINK:    All right. Does anyone agree with that? . . .

. . . .

ANDERSON: Juror 3, Anderson.

THE COURT: She's number 6.

. . . .

**Potential Juror Johnson**

MINK:       [W]ho believe[s] that commercial trucks need to be on separate roads from passenger vehicles, your name please or your number if you know it.

JOHNSON:   Panel 5 juror 7.

MINK:       Ms. Johnson. Anything you want to add to that?

JOHNSON:   Just my brother, he's a commercial driver and just hearing some of the things that happened, you know, we've all had when we're on the interstate or something and people come over on you and so I just have in my head that I do not ride beside an 18-wheeler because either they may come over on you or they just can't see you and they come over on you, so I either, you know, try to get pass them as fast as I can or I just kind of lay back and let them go ahead. They can't see us so why would -- I'm kind of like that they shouldn't be on the same roads especially on I-55.

MINK:       Okay. Do you believe that a driver of a commercial vehicle has a greater responsibility than drivers in passenger vehicles to avoid accidents?

JOHNSON:   Not really, because I believe that we're able to see their full vehicle, so we're to take responsibility on yourself [sic] to either slow down or pass them because they have more blind spots than we do. That's my opinion.

MINK:       Yes, ma'am. All right. That was Ms. Johnson, 5/7. All right. Hands are up . . . . Your number, please.

. . . .

**Potential Juror Davis**

DAVIS:      Panel 6 juror 10.

MINK:       Okay.  Tell us your belief or your take on that.

DAVIS:      I believe that 18-wheelers should have their own roads. Like I say, my husband drives trucks and he always speak about the blind side where he didn't see somebody. And like even with the accident that I was involved in, I honestly believe that the 18-wheeler did not see us because like we was pass the last vehicle when he started to get over. So I'm assuming that's the only way he could see us. So, like, if we wasn't on the same

22

MINK: highway with them then maybe it wouldn't be that dangerous.
MINK: Yes, ma'am. What you're describing is the accident that you've already talked about earlier today.
DAVIS: Right.

. . . .

MINK: [A]re you Ms. Butler?

. . . .

### Potential Juror Butler

MINK: All right. Tell us your position on that, please.
BUTLER: I feel like Mr. Speaks actually made a good point because a lot of times like you could be riding down the expressway and just out of the blue an 18-wheeler will swerve just out of the blue. And, I mean, I've never been in an accident with an 18-wheeler, but just like Ms. Davis, I'm afraid of them, always has been because of that. So, you know, it would be a little safer for them to either have different times to be out or have their own routes to go to keep them out of the everyday drivers I guess you'd say or regular vehicle drivers, you know, and sometimes even, you know, again, we can be in their blind spot, and it is your duty -- I've always been told, you have to drive for yourself and others. So either pull back and let them go where they're going or get away -- get out of their way for them to continue or be able to go. I've witnessed a lot of times, you know, you're beside them and they'll put their signal light on and just jump. And, you know, that's -- that can run you off the road trying to get out of their way. So, I mean, it should be something else in place for this.

. . . .

### Potential Juror Pickering

PICKERING: Yes, Anthony Pickering, panel 8. I'm kind of like they were saying because, yes, I think that the truck drivers should have their own highway or lane or however that is. But I also think that -- I was always taught to always give trucks their leeway. I mean, when you're driving on side of the truck or when you see a truck always give trucks their leeway.
MINK: Mr. Pickering, are you afraid of trucks the way some of

23

|  | the other members of the venire expressed? |
| PICKERING: | No, I'm not. No, huh-uh. No, I'm not. |

¶39.  It is important to note several obvious points about the afore referenced exchange between counsel for Kirk and potential jurors.  First, the individuals were responding to questions asked by Kirk.  Second, and more important, Kirk never followed up with any individual who responded whether that personal opinion could or would affect their ability to be impartial and follow the law.  Kirk never explored if those opinions expressed in response to his questions would influence them if selected as a juror.  Kirk never asked the court for permission to approach for a sidebar conference with the answering juror to prevent the other potential jurors from  hearing  the responses to his questions.  Finally, Kirk never ask the court to squash the venire or for a mistrial due to potential bias or prejudice from comments made by jurors in responding to questions he asked.

¶40.  Pursuant Mississippi Rule of Civil Procedure 59(a), a new trial may be granted if "the verdict is against the overwhelming weight of the evidence" or if "the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice." *Rogers v. Thames*, 309 So. 3d 1154, 1164 (¶25) (Miss. Ct. App. 2021) (quoting *Bobby  Kitchens*, 560 So. 2d at 132 (citing M.R.C.P. 59(a))).  However, "[t]he jury is the judge of the weight of the evidence and the credibility of the witnesses." *Id.* at 1164 (¶25) (quoting *Bobby Kitchens*, 560 So. 2d at 131).  Therefore, "this Court resolves all conflicts in the evidence" and "draws . . . all reasonable inferences in favor the jury's verdict." *Id.* (internal quotation marks omitted).

¶41.  Kirk cites *Shields v. Easterling*, 676 So. 2d 293 (Miss. 1996), in his brief, however, that case is not very instructive as to Kirk's argument of jury "bias, passion, or prejudice."

In that case, Shields sued Easterling for damages after they were involved in a automobile accident. The jury returned a verdict for Easterling. Shields argued the jury's verdict was the result of bias, passion or prejudice. The Mississippi Supreme Court concluded that Shields's argument was without merit because Shields "offer[ed] no proof of bias, passion or prejudice toward her, save that the jury did not find in her favor." *Shields*, 676 So. 2d at 298. The supreme court explained that the jury's verdict, finding Shields did not prove the defendant was negligent, was based on "sufficient testimony" and "there [was] nothing in the record to show any abuse of discretion." *Id.*

¶42. Further, "[e]vidence of bias, prejudice, or passion may be inferred by contrasting the amount of damages with the amount of the verdict." *Hubbard v. Canterbury*, 805 So. 2d 545, 549 (Miss. Ct. App. 2000) (citing *Green v. Grant*, 641 So. 2d 1203, 1209 (Miss. 1994); *Pham v. Welter*, 542 So. 2d 884, 888 (Miss. 1989); *James v. Jackson*, 514 So. 2d 1224, 1225 (Miss. 1987)). By way of example only, courts have held that "[p]roof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable." Miss. Code Ann. § 41-9-119 (Rev. 2018). The opposing party may rebut necessity and reasonableness by "proper evidence." *Jackson v. Brumfield*, 458 So. 2d 736, 737 (Miss. 1984). In *Jackson*, the supreme explained:

> [w]hen a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable. However, the opposing party may, if desired, rebut the necessity and reasonableness of the bills by proper evidence. **The ultimate question is then for the jury to determine**.

25

*Id.* (emphasis added). While the issue of medical bills was not contested in this case, the issue of damages were. The guidance from the supreme court is instructive. It is for the jury to decide the amount of damages when they are contested as they were in this case.

¶43. In *Classic Coach Inc. v. Johnson*, 823 So. 2d 517 (Miss. 2002), the Mississippi Supreme Court emphasized:

> Dealing with the amount of verdicts is one of the most troublesome questions with which the courts have to struggle. There is no exact yardstick, or measurement, by which to test the question. Each case must depend upon its own facts. The test is not what amount the members of the court would have awarded had they been upon the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is so excessive as to indicate that the jury was animated by passion, prejudice, or corruption. We think the verdict was large, but considering all the circumstances, including the age of the plaintiff, we are not able to say the amount of the verdict was the result of passion, prejudice or corruption.

*Id.* at 530 (¶48) (citing *Peerless Supply Co. v. Jeter*, 218 Miss. 61, 65 So. 2d 240 (1953)).

Here, there is simply no proof in the record that any bias, passion, or prejudice produced the verdict in this case. The jurors' personal opinions elicited by Kirk during voir dire were just that–personal opinions. Kirk failed to make any effort to utilize long-standing voir dire safety features such as individual questioning or inquiring about a juror's ability to set aside a personal opinion and follow the law, to name a few. Setting aside a jury verdict base on an incomplete record without proof in the record as to bias, passion, or prejudice, would be an appellate exercise in rank speculation beyond the scope of our standard of review. In accordance with this Court's appropriate standard of review and for reasons previously discussed, we cannot say that the jury's verdict was contrary to the overwhelming weight of the evidence or a product of bias, passion, or prejudice.

26

**3.    Whether Newton's experts' opinions on future lost wages should have been excluded because they improperly relied upon national averages rather than Newton's own wage history.**

¶44.    On appeal, Kirk claims the jury's verdict as to future lost wages should be overturned and a new trial awarded. His argument centers on the fact that Martina used a national average salary for LPN which was used by Koerber to determine future lost wages.[11] Kirk asserts that the *Rebelwood* case, *infra* ¶45, prohibits using national averages and requires the actual pre-accident wages of Newton should have been used when determining future lost wages.[12] In the alternative, Kirk argues the award of future lost wages should be remitted to zero.

¶45.    Kirk relies on a Mississippi Supreme Court case, *Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483 (Miss. 2010), as support for remanding a new trial. In that case, *Rebelwood* did not object to Glover's qualification as an expert but argued that Glover's

---

[11] Before trial, Kirk filed a motion in limine to prevent Martina from giving opinions as to Newton's future lost wages because she had relied on statistical averages rather than Newton's historical wage-earning capacity. During trial, when Martina was tendered as an expert, Kirk renewed his objection. The trial court overruled his objection. At trial, during Martina's testimony, Martina testified that the statistical averages were comparable to Newton's pre-accident hourly wages with Stay Home. Koerber testified he used the national average because it was lower than Newton's annualized pre-accident wages.

[12] In Kirk's brief, he also argued that during closing argument, Newton's counsel "attempted to further inflame passions by suggesting . . . Kirk's . . . expert witness on damages was trying to keep Newton economically depressed." Kirk explained "[t]he argument suggested Newton was worthy of compensation because she had, over the years, worked to better herself economically, and that an award of anything less than the full amount of future damages based on Newton's expert's testimony on national averages somehow devalued Newton." However, Kirk never made an objection during closing argument. Therefore, this issue was waived. *See Walker v. State*, 913 So. 2d 198, 217 (¶49) (Miss. 2005).

"proposed testimony was not based on sufficient facts," thereby arguing Glover's opinion "was not based on accurate, truthful facts." *Id.* at 494 (¶50). During trial, Glover testified that he determined that English's loss of income was $1,163,060.00, by using the national-average wage earnings salaries of $38,651.00 for her annual income in the year 2007. However, English had an actual earnings history of more than five years and had never actually earned in any of those five years anything close to the amount of the national average. According to English's tax returns, her income in 2005 and 2006 was $10,585.00 and $13,099.00, respectively. Nevertheless, Glover's report stated, "Though she was earning $6.70 at the time of her death, in applying the earnings capacity approach, income of $38,651 is used based on the National Income Average." *Id.* at 489 (¶28).

¶46. In *Rebelwood*, the supreme court found the trial court had abused its discretion in admitting Glover's testimony because her testimony "fail[ed] the requirement that it be based on sufficient facts or data." *Rebelwood*, 48 So. 3d at 496 at (¶58). The supreme court explained that "[Mississippi] caselaw does not support the use of the assumptions she utilized under the facts of this case." *Id.* Therefore, Glover's testimony regarding lost future income was inadmissible. In addition, the supreme court explained "[t]he paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Id.* at 496 (¶57). The supreme court also cited *Culver v. Slater Boat Co.*, 722 F.2d 114, 123 (5th Cir. 1983):

> Courts are not prophets and juries are not seers. In making awards to compensate injured plaintiffs or the dependents of deceased workers for loss of future earnings, however, these fact-finders must attempt, in some degree, to gauge future events. Absolute certainty is by the very nature of the effort

impossible. It is also impossible to take into account every bit of potentially relevant evidence concerning the tomorrows of a lifetime. The approach we adopt attempts to assure plaintiffs a fair measure of damages, to give defendants a reasonable adjustment for reducing future losses to present value, and to avoid making trials even more complex and their results even more uncertain. It is the product of a balancing of competing values. Ultimately, however, that is the root of all justice.

In its conclusion, the supreme court said "[Mississippi] caselaw is designed to assure a fair and predictable determination to replace what has been lost; [therefore] in limiting the basis for the lost income stream to actual income, courts do not determine the value of injured people or speculate on their capacity for more remunerative employment." *Rebelwood*, 48 So. 3d at 497 (¶60).

¶47. Further, it is important to note that also in *Rebelwood*, Glover injected race into her testimony to justify the use of national averages. The supreme court stated that "[r]ace was injected at least twice in Glover's testimony: first, upon prompting by English's counsel, and second, when asked by Rebelwood's counsel how she could assume a base income of more than $38,000." *Id.* at 496 (¶56). The supreme court then held it error to allow "irrelevant, prejudicial and inflammatory statements." *Id.*

¶48. The testimony in the case sub judice is very different from *Rebelwood*. First, there was no improper race component in the conclusions reached by Newton's experts. Second, in *Rebelwood*, Glover used the national average without any basis that she could actually earn the national average. Here, Newton's annualized pre-accident wage was more than the national average. In an effort to be conservative, Martina and Koerber chose the national average, the lower figure, to determine future lost wages. Therefore, unlike *Rebelwood*, there

29

was an actual evidentiary basis (two different methods to determine annualized actual wage-earning capacity) as to why the national average wages were used.

¶49.     Newton called two witnesses to address her past lost wages, future lost wages and the cost of her life care plan.  Martina was a vocational rehabilitation expert.  Martina testified she considered Newton's historical earnings but indicated that she ultimately decided to rely on the statistical averages in determining Newton's pre-accident wage earning capacity because Newton had not worked a sufficient amount of time as a LPN.  Martina's report discussed the actual national average used as $35,145.00 but never actually was asked to testify as to that amount in front of the jury.[13]  Additionally, Martina identified the job positions that Newton had held before the wreck, and she identified specific jobs that Newton could perform in the future.  According to Martina, those potential jobs in the future would be less money than Newton was earning but still allow her to earn between $16,460.00 and $20,840.00 per year.

¶50.     Koerber explained that Martina used the national average for LPN salaries, and he adopted that figure in his determination of future lost wage.  However, his testimony explained why:

> I did look at Ms. Martina's report regarding Ms. Newton's earning capacity. It came out to an average of $35,145.00, but as a forensic economist you're supposed to do your due diligence. I looked at the earnings that Ms. Newton

---

[13]  Martina did explain why she used the national average and how it was "comparable" to Newton's annualized pre-accident wages she was earning at the time of the accident.  Koerber actually discussed all of the figures, the national average, the two different methods he used to the determined a pre-accident annualized wage for Newton and explained how the national average was the lower of the three quoted figures and that was why he used it.

was actually making at that time. She had started working for Stay Home around May 1st of 2015 and had worked 15 periods and made around $11,000.00. That worked out to $741.00 per week. If you annualize that it was $38,533.00; therefore, what Ms. Martina came up with was less. So even though her actual earnings for that period where she was working at the time, actually earning, was higher, I used the lower amount that Ms. Martina used. I also looked at what Stay Home had said that Ms. Newton would earn based on just a flat salary of $17.50 an hour and multiplied that by 2,080 hours. It came to $36,400.00. And, again, the amount that Ms. Martina came up with was less than what Stay Home had said that Ms. Newton would earn.

Koerber explained the national average was actually lower than what he determined Newton's pre-accident annualized wage was. Therefore, he chose to use the lower figure, the national average, to calculate lost wages. He opined that past lost wages amounted to $78,762.00 and future lost wages were $604,121.00.

¶51. In an effort to respond to and counter Martina and Koerber, Kirk called vocational rehabilitation expert, Brawner and economist, Dr. Lee. Brawner testified that Newton could still earn $25,605.00 wages doing sedentary jobs. That wage was higher than her pre-accident wages she reported in 2016. Brawner explained that Newton will actually earn more money in the future doing sedentary jobs, considering she made only $17,605.00 in 2016; therefore, she has a zero vocational disability.

¶52. Dr. Lee "reviewed primarily" Brawner's report that used pre-accident income of $17,605.00, from the 2016 tax return. Dr. Lee determined, like Brawner, that Newton could earn $25,605.00 doing sedentary jobs which was more than she earned in 2016. Therefore, he opined Newton had a "zero vocational disability." Dr. Lee's opinion concerning Newton's lost wages differed from Newton's experts too. Dr. Lee testified that his calculation of Newton's lost wages from the accident were $34,113.00. Dr. Lee opined that

31

Newton's life care plan was present value between $355,244.00 and $476,203.00. He indicated that Brawner's opinion of the cost of the life care plan was present value between $105,513.00 and $118,702.00.[14]

¶53. Both parties presented expert witnesses offering different opinions. Martina did use national averages, but in this case, those figures were similar to and actually less than the actual annualized wage Newton was earning as an LPN at the time of the accident. Kirk conducted a cross-examination contesting the validity of those numbers. "It is well-settled law that when conflicting expert testimony is presented, 'the winner in a battle of the experts is to be decided by a jury.'" *Hathaway v. Lewis*, 114 So. 3d 783 787 (¶14) (Miss. Ct. App. 2013) (quoting *Hill v. Mills*, 26 So. 3d 322, 330 (¶28) (Miss. 2010)).

¶54. The jury obviously relied on Martina and Koerber's testimonies when finding Newton's past lost wages and future lost wages to be $78,762.00 and $604,121.00, respectively. The only complaint as to methodology complained about on appeal relates to the future lost wages of $604,121.00. Kirk argues that because the figures used by Martina and Koerber were national averages and that the Mississippi Supreme Court has held that to be error in *Rebelwood*, the jury's verdict should be overturned and this case remanded for a new trial. However, in this case, the national averages were less than the actual annualized wage Newton was earning at the time of the accident. Because the national averages were similar in nature to Newton's actual annualized wage and Koerber indicated he conducted his own determinations and only used the national average because it was lower than

---

[14] Kirk's attorney admitted in an objection that Brawner's life plan was "limited."

Newton's projected annualized wage, this Court cannot say reversible error occurred in the methodology which rendered their opinions into the realm of prohibitive speculation.[15]

¶55.    Here, at the trial of this case, four experts testified as to lost wages, two for Kirk and two for Newton. As is very common, those experts testified as to their ultimate opinions and how they reached those opinions. As is even more common, Newton's experts' opinions were quite different than Kirk's experts' opinions. That is what trial lawyers often referred to as the battle of the experts. This is not new or novel. It happens in courtrooms every day of every week all over this country. This Court should not reconsider the battle of the experts because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 596 (1993). The supreme court has clarified this issue and it is worth repeating:

> Each case must depend upon its own facts. The test is not what amount the members of the court would have awarded had they been upon the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is so excessive as to indicate that the jury was animated by passion, prejudice, or corruption.

*Classic Coach*, 823 So. 2d at 530 (citing *Peerless Supply Co. v. Jeter*, 218 Miss. 61, 65 So. 2d 240 (1953)).

¶56.    The issue of the experts offering different opinions is not a new issue before this court. In *Fonville v. Zeid*, 327 So. 3d 658 (Miss. Ct. App. 2021), a medical malpractice case,

---

[15] In this case, even if the use of the national average wage for a LPN was held to be error, it would be harmless error as the national average was lower than the annualized wage-earning determination, which, if used, would have produced a higher future lost wage damage.

33

both parties offered conflicting testimony concerning the source of the injuries. *Id.* at 672 (¶42). This Court said "[w]hile this Court might consider opposing testimonies in an evaluation of the weight or sufficiency of the evidence, we have no place comparing the two in determining the admissibility of one of their opinions." *Id.* at 671 (¶39) (citing *Clark v. State*, 315 So. 3d 987, 997 (¶23) (Miss. 2021)). As previously stated, that scenario is considered a "battle of the experts," in which the jury makes the ultimate decision. *Id.* (quoting *Hill*, 26 So. 3d at 330 (¶28)). This issue is without merit.

¶57. Kirk also claims that the circuit court abused its discretion when it denied Kirk's motion for remittitur, which was included in the motion for judgment notwithstanding the verdict or motion for a new trial. Kirk mentions in his brief for this Court to consider a remittitur in the alternative. "The standard of review for the denial of a remittitur is abuse of discretion." *Entergy Miss. Inc. v. Bolden*, 854 So. 2d 1051, 1058 (¶20) (Miss. 2003). "There are no fixed standards as to when an additur or remittitur is proper." *Id.* However, this Court "will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, shocks the conscience." *Id.* "The jury's verdict [in a civil case] is a finding of fact." *Edwards v. Ellis*, 478 So. 2d 282, 289 (Miss. 1985) (quoting *City of Jackson v. Locklar*, 431 So. 2d 475, 481 (Miss. 1983)). "Even if we think the amount awarded in the verdict is liberal, we are not allowed to supplant our judgment for that of the jury unless we conclude that there was insufficient evidence to support the award of damages or that the verdict was the product of bias, passion, or prejudice." *Gen. Motors Corp. v. Pegues*, 738 So. 2d 746, 755 (¶25) (Miss. Ct. App. 1998) (citing *S. Cent. Bell Tel. Co. v.*

34

*Parker*, 491 So. 2d 212, 217 (Miss. 1986)). The Mississippi Supreme Court has repeatedly stated, "Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found." *E.g.*, *Bell v. City of Bay St. Louis*, 467 So. 2d 657, 660 (Miss. 1985). "Judges cannot sit as jurors, and the question before them is never what they would have done sitting as a juror but whether, considering the evidence in the light most favorable to the non-moving party, together with all reasonable inferences which may be drawn therefrom, the court should disturb the jury verdict." *Holmes Cnty. Bank & Tr. Co. v. Staple Cotton Co-op. Ass'n*, 495 So. 2d 447, 451 (Miss. 1986). Since there was actual and substantial testimony proving the figures the jury rewarded, we find the trial court did not abuse its discretion in denying Kirk's motion for remittitur .

¶58.    Finally, Kirk argues throughout his brief but not as a designated issue that the jury demonstrated bias and prejudice due to the large nature of the ultimate verdict. In addition to lost wages which have been discussed, the jury also awarded $784,299.00 for future medical expenses for future surgeries, diagnostic procedures, physical therapy after each surgery and doctor visits. Martina and the medical doctors who testified all expressed that Newton would need future medical care. Further, figures for each surgery and the different types of medical procedures necessary were testified to by witnesses. The future medical expense figure was supported by the life care plan created by Martina and discussed by Koerber. There was substantial evidence proving the amount awarded. Newton's past

35

medical expenses were undisputed and totaled $292,585.32. Lastly, the jury awarded $1,000,000.00 for non-economic damages such as pain, suffering, and loss of enjoyment of life. Here, the jury heard from Newton as to her injuries, surgeries, pain and suffering, permanent disabilities, and the many things she can no longer do which she could do before the accident. That information was corroborated by officers on the scene, the medical doctors and Martina. Further, one of her treating physicians testified that Newton lost "71 percent of the use of her right leg," which was a loss of 28% to the body as a whole in permanent impairment. Considering the severity of Newton's injuries and the many surgeries she has already experience and will experience in the future, a jury could have easily concluded her injuries produced substantial pain and suffering and loss of enjoyment of life. The damages awarded by the jury were not excessive in light of the clear and substantial evidence supporting such damages.

### 4. Whether Kirk and I.B. Logistics are entitled to a new trial because Newton improperly interjected the issue of insurance.

¶59. Kirk claims that a new trial was warranted after Newton mentioned insurance in front of the jury. Under our rules, "[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." MRE 411. Evidence of insurance was not admitted in this case "to prove whether [Kirk and I.B. Logistics had] acted negligently or otherwise wrongfully." The following exchanged occurred during Kirk's cross-examination of Newton:

36

Q. All Right. After you talked to Trooper Jones, during that conversation what did he say about what he was going to do, if anything?
A. He said he would redo the report. He also said that Mr. Kirk told him I did not have insurance. My license was suspended after that.

MR. MINK:       Excuse me. Your Honor, may we approach.
THE COURT:      That'll be fine. All right.

**(BENCH CONFERENCE BEGINS)**

THE COURT:      Go ahead.
MR. MINK:       I had no idea– I didn't ask her a question about insurance. Can we just do a bench conference not to mention anybody's insurance.
THE COURT:      Okay. Let's stay away from that. I think it's gone so you think is going to come back up now?
MR. MINK:       No, sir.
THE COURT:      Okay. So let's move on from that. We'll tell her.

**(WITNESS INSTRUCTED)**
**(BENCH CONFERENCE ENDS)**.

¶60. During Newton's cross-examination, she voluntarily interjected that Kirk informed Trooper Jones that she did not have insurance.[16] This raised the issue of insurance with the jury because the statement implied that Kirk and I.B. Logistics had insurance and Newton did not. Rule 411 of the Mississippi Rules of Evidence provides that "[e]vidence that a person was or was not insured against liability is not admissible to prove whether [he] acted negligently or otherwise wrongfully."[17] The record is clear that Kirk did not object to

---

[16] Kirk and I.B. Logistics filed a motion in limine to prohibit the mention of liability insurance; "Defendants move to exclude any evidence, reference or testimony of proof of liability insurance for the Defendants." The court did not specifically rule on this motion as it was not opposed by plaintiff's counsel.

[17] "There is a long-standing principle of law in this State that gratuitously informing the jury, or even intimating to the jury, that any verdict returned by them will be satisfied by the defendant's liability insurance provider so interferes with the jury's ability to fairly

37

Newton's statement relating to her lack of insurance. "The failure of an objection is fatal." *Johnson v. State*, 477 So. 2d 196, 204 (Miss.1985). This Court has held that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994). Instead of objecting, Kirk simply asked the court to instruct the witness not to mention insurance. The court did as requested. Kirk did not ask for the answer be stricken. Kirk did not ask for a mistrial. Kirk did not ask for a curative instruction. This is issue is waived.

## CONCLUSION

¶61.    We affirm the verdict of the jury. There was conflicting testimony as to who actually caused the accident, and the jury decided that issue of fact. As to damages, there was no evidence of bias, passion, or prejudice proved by Kirk that would meet the appellate standard of review for reducing or setting aside the actual damages awarded. The use of a national average, when the annualized wage actually being earned by Newton at the time of the accident was higher than the national average, was not error, as the jury heard the evidence presented by both parties' experts and decided the weight and worth of the expert testimony. Finally, Kirk failed to preserve for appellate review the issue of insurance being mentioned before the jury.

---

deliberate the true issues of the case as to constitute reversible error." *Toche v. Killebrew*, 734 So. 2d 276, 283 (Miss. Ct. App. 1999) (citing *Snowden v. Skipper*, 230 Miss. 684, 696, 93 So. 2d 834, 839 (1957); *Odom v. Walker*, 193 Miss. 862, 871-72, 11 So. 2d 452, 455 (1943); *Herrin v. Daly*, 80 Miss. 340, 342, 31 So. 790, 791 (1902)). Here, the mention of insurance came in an answer to a question about what Newton discussed with Trooper Jones. It had nothing to do with Kirk's insurance. It had nothing to do with liability. It a was lay person, unskilled in the rules of evidence, giving a truthful answer to a question asked during cross-examination.

¶62.   **AFFIRMED.**

   **BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

   **GREENLEE, J., DISSENTING:**

¶63.   Based upon the overwhelming evidence at trial, I believe that the circuit court abused its discretion by denying the motion for a new trial. Also, as Newton's mentioning of insurance had an insidious effect on the jury, the verdict clearly was a result of bias, passion, and prejudice and against the overwhelming weight of the evidence. Therefore, I dissent.

¶64.   I must begin with a recitation of the facts to include key facts absent from the majority's recitation.

¶65.   In October 2017, Newton filed a complaint against Kirk and I.B. Logistics Inc. alleging that she was driving a Nissan Altima when Kirk drove a Dodge Ram truck with an attached Big Tex automobile-hauler trailer into her lane, causing the front of her automobile to strike the rear of the trailer.[18] In response, Kirk and I.B. Logistics admitted that Kirk was acting within the course and scope of his employment when the wreck occurred. They asserted, however, that Newton's negligence in failing to exercise reasonable care was the proximate cause or a contributing cause of her injuries because she hit Kirk from behind.

¶66.   A trial was held in September 2020. During the plaintiff's voir dire, plaintiff's

---

[18] The majority notes that Newton included a wrongful-death claim on behalf of her unborn child. The parties, however, entered an agreed order granting partial summary judgment on the wrongful-death claim because Newton admitted that she could not show that at the time of the accident, she was carrying "an unborn quick child" within the meaning of Mississippi's wrongful-death statute.

counsel asked the venire if anyone had driven an 18-wheeler or a commercial vehicle. After telling the venire that the case "involve[d] a driver of a commercial vehicle," a potential juror said, "I . . . cringe just beside an 18-wheeler riding by me . . . ."[19] Later, during the defense's voir dire, defense counsel asked the venire if anyone believed that commercial drivers had a greater duty to avoid a wreck. In response, a potential juror said, "As a CDL operator, I think there is a higher responsibility for commercial drivers in general." Then a potential juror suggested that commercial vehicles should have their own highway. When defense counsel asked if anyone else shared that opinion, potential jurors expressed a fear of 18-wheelers and a belief that they had more blind spots than other vehicles, and one potential juror did not drive beside 18-wheelers because they "may come over on you." When defense counsel indicated that Kirk was driving a truck with an attached trailer and not an 18-wheeler, a potential juror said, "I think it falls in the same category." It is true that defense counsel never asked the court to quash the venire or requested a mistrial due to potential bias or prejudice. During the jury selection process, however, several of the potential jurors were challenged for cause based on their belief that commercial vehicles should have their own highway. One of the jurors who was challenged on that basis ended up on the jury.

¶67. During trial, Newton testified that she was a licensed practical nurse (LPN) and was driving to a patient's house when the wreck occurred on August 22, 2017. According to Newton, she was driving approximately 65 miles per hour in the right southbound lane of Highway 49 when the vehicle Kirk was driving moved without warning from the left

---

[19] The majority implies that the venirepersons were responding to questions only asked by defense counsel. I disagree.

southbound lane into her lane. Newton testified that she tried to swerve her Nissan Ultima to the left but hit the right rear of the trailer, causing her vehicle to spin. According to Newton, after the wreck occurred, Kirk reconnected something at the back of the truck and then moved the truck down the highway.

¶68. Newton realized that the accident report only contained Kirk's statement, so she contacted Officer Calvin Jones sometime after the wreck occurred to give her statement. She testified that she told Officer Jones that Kirk appeared to reconnect something after the wreck, as if something had detached from the truck and trailer. According to Newton, Officer Jones said that he would amend the accident report and then mentioned to her "that . . . Kirk told him [that she] did not have insurance." Newton testified that her "license was suspended after that." At that point in the trial, defense counsel approached the bench, and the following colloquy occurred:

> COURT: Go ahead.
> COUNSEL: I had no idea - - I didn't ask her a question about insurance. Can we just do a bench conference not to mention anybody's insurance.
> COURT: Okay. Let's stay away from that. I think it's gone so you think it's going to come back up now?
> COUNSEL: No, sir.
> COURT: Okay. So let's move on from that. We'll tell her.
> COUNSEL: Okay.
>
> (*WITNESS INSTRUCTED*)
> (*BENCH CONFERENCE ENDS*).

¶69. Deputy Edward Ferrell with the Yazoo County Sheriff's Office, testified during direct examination that he saw skid marks that "started in the right lane and c[a]me to rest where [Newton's] car was across both lanes." On cross-examination, while looking at photographs

41

of the scene, Deputy Ferrell testified that he saw fluid in the left lane and a lot of debris in the left lane, but he did not see any skid marks. Despite testifying that the skid marks came to rest where Newton's vehicle was across both lanes, Deputy Ferrell indicated on redirect that the photographs did not show what he saw at the scene and only depicted the scene "right around [Newton's] vehicle." Finally, Deputy Ferrell testified that a large trash can was on the side of the road.

¶70.    Kirk testified—as an adverse witness and on his own behalf—that before the wreck occurred he had transported an automobile to Cleveland, Mississippi, using a Dodge Ram Dooley with an attached 40-foot trailer. After delivering the vehicle, he was driving in the left southbound lane of Highway 49 when he noticed a trash can approximately one-quarter of a mile away. Kirk testified that he turned his flashers on and looked in the rearview mirror. According to Kirk, he could not move into the right lane because of other vehicles, and he could not swerve to the left because the median was too steep. Kirk testified that he slowed down from 65 miles per hour to approximately 30 to 35 miles per hour. When he looked in the mirror again, he saw Newton's vehicle in the left lane swerve seconds before hitting the trailer.[20] Kirk testified that he did not change lanes, and he disputed Newton's testimony that he checked to see if the trailer was still attached to the truck after the wreck occurred.

---

[20] Kirk seemingly stated during his deposition that he did not know where Newton's vehicle had been before the wreck and that he did not look in the mirror before applying the brakes. However, he later clarified that he stated during his deposition that he was unsure of where Newton's vehicle had been one-quarter of a mile before the wreck's location. He also clarified that when he was asked, during his deposition, when he first saw Newton's vehicle, he responded "moments before" the wreck occurred.

¶71.    Officer Jones testified that he noticed debris in the left lane, fluid in the left lane, and a trash can on the side of the road when he arrived at the scene of the wreck.   When questioned about skid marks, Officer Jones said that he did not see any.[21]   Additionally, Officer Jones testified that he amended the accident report with the following information that he received from Newton sometime after the wreck occurred: "[Newton] stated that [Kirk] passed her, [and] after getting in front[,] the trailer became disconnected from the truck causing her to collide with the trailer. [Kirk] reconnected the trailer and pulled it out of [the] roadway."

¶72.    To reiterate, Dr. Preston Scarber Jr.—an expert in accident reconstruction—testified that he performed a reconstruction study after the wreck.   He testified that he went to the scene of the wreck, obtained drone footage of the site, inspected both vehicles, and reviewed photographs that were taken after the wreck occurred. According to Dr. Scarber, he did not find any evidence in the right lane, and he initially hypothesized that the wreck most likely had occurred in the left lane.

¶73.    Dr. Scarber explained that he had certain "targets" to match in reconstructing the wreck: (1) the Nissan's crush effect, (2) the Nissan's final resting position, (3) the Nissan's orientation, (4) the trailer's damage, and (5) the hypothetical point of impact—the left lane. According to Dr. Scarber, a simulation was considered 75% reliable if it met three targets. He testified that the simulation in this case—showing that the impact occurred in the left lane—met five targets.   Therefore, he believed that Kirk's testimony that the wreck occurred

_____

[21] Kirk also testified that he did not see any skid marks.

in the left lane was the "most likely" scenario for how the wreck occurred. He further testified that in order to meet all five targets, the wreck could have occurred only in the left lane.

¶74. Dr. Scarber testified that he also created a simulation using Newton's testimony about how the wreck occurred—she was driving in the right lane when Kirk merged in front of her. That simulation, however, did not meet all five targets. Additionally, Dr. Scarber testified that the device that attached the trailer to the truck was bent approximately forty-five degrees. According to Dr. Scarber, it had to have been attached to the truck at the time of the wreck for that to occur.

¶75. Ultimately, ten jurors found that Kirk had been 100% negligent and awarded Newton the following amounts in damages: $292,582.32 in past medical expenses, $78,762 in past lost wages, $784,229 in future medical expenses, $604,121 in future lost wages, and $1,000,000 in non-economic damages. The circuit court "awarded [j]udgment against the Defendants . . . in the total sum of $2,759,094[.]32 together with interest at the legal rate thereon until fully paid." The defendants filed a "motion judgment notwithstanding the verdict or new trial or, in the alternative, remittitur," which was denied. Then Kirk and I.B. Logistics appealed.

¶76. As noted by the majority, "[a] trial judge may order a new trial if 'the verdict is against the overwhelming weight of the evidence.'" *Brewer v. Bush*, 350 So. 3d 1133, 1139 (¶10) (Miss. Ct. App. 2022) (quoting *Bobby Kitchens Inc. v. Miss. Ins. Guar. Ass'n*, 560 So. 2d 129, 132 (Miss. 1989)). "A motion for a new trial is addressed to the discretion of the

44

trial judge." *Id*. (citing *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶18) (Miss. 2000)). "However, that discretion 'should be exercised with great caution' and 'invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *Id*. (quoting *Amiker*, 796 So. 2d at 947 (¶18)).

¶77. When we review the denial of a motion for a new trial, we afford the trial court "substantial deference to its determination on the weight of the evidence issue and whether to grant a new trial." *Id*. at (¶11). We will only reverse "when such denial amounts to an abuse of that judge's discretion." *Id*. (quoting *Bobby Kitchens*, 560 So. 2d at 132). Additionally, we give "great deference to the jury verdict itself." *Id*. at (¶12) (quoting *Weber v. Est. of Hill*, 335 So. 3d 1030, 1038 (¶36) (Miss. 2021)). "A new trial may be granted where the verdict is against the overwhelming weight of the evidence" or "when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice." *Phillips 66 Co. v. Lofton*, 94 So. 3d 1051, 1070 (¶58) (Miss. 2012) (quoting *Coho Res. Inc. v. Chapman*, 913 So. 2d 899, 908 (¶28) (Miss. 2005)).

¶78. At the outset of the trial, the jury was prejudiced by venire persons who displayed bias against commercial drivers during voir dire. As discussed, during the plaintiff's voir dire, plaintiff's counsel asked the venire if anyone had driven an 18-wheeler or a commercial vehicle. After telling the venire that the case "involve[d] a driver of a commercial vehicle," a potential juror said, "I . . . cringe just beside an 18-wheeler riding by me . . . ." Later, during the defense's voir dire, a potential juror indicated that "[a]s a CDL operator," he believed commercial drivers had a greater duty to avoid a wreck. Another potential juror

45

suggested that commercial vehicles should have their own highway. This prompted other potential jurors to express a fear of 18-wheelers and a belief that 18-wheelers had more blind spots than other vehicles. Although defense counsel clarified that Kirk was driving a truck with an attached trailer and not an 18-wheeler, at least one juror believed that "it [fell] in the same category." Again, it is true that defense counsel never asked the court to quash the venire or requested a mistrial due to potential bias or prejudice. During the jury selection process, however, several of the potential jurors were challenged for cause based on their belief that commercial vehicles should have their own highway. One of the jurors who was challenged on that basis ended up on the jury.

¶79. Additionally, and of more import, Newton's testimony that she did not have insurance insidiously affected the jury's verdict in this case, causing it to be the result of bias, passion, and prejudice. At trial, Newton testified that she contacted Officer Jones sometime after the wreck occurred to give her statement. According to Newton, Officer Jones said that he would amend the accident report and then mentioned to her "that . . . Kirk told him [that she] did not have insurance." Newton testified that her "license was suspended after that." The majority does not attempt to address the effect that this testimony had on the jury's verdict. But considering the evidence that was presented at trial (discussed below) and the amount of damages that the jury awarded, this testimony caused the jury's verdict to be the result of bias, passion, and prejudice.[22]

_____

[22] Additionally, I disagree with the majority's holding that the separate issue of whether a new trial was warranted after Newton mentioned insurance in front of the jury was waived based on a failure to object at trial. The majority acknowledges that the defendants filed a motion in limine to prohibit the motion of liability insurance, and our supreme court

¶80.   It is clear that the jury's verdict is contrary to the overwhelming weight of the evidence. At trial, Kirk testified that he was driving in the left lane when he noticed a trash can approximately .25 miles away. When he looked in the mirror, he saw Newton's vehicle in the left lane swerve seconds before hitting the trailer. Although Newton testified that she never saw a trash can, at least two officers confirmed that one was on the side of the road when they arrived at the scene.

¶81.   Dr. Scarber's testimony was consistent with Kirk's testimony. While conducting the accident reconstruction, Dr. Scarber did not find any evidence in the right lane. Dr. Scarber testified that the simulation in this case—showing that the impact occurred in the left lane—was the most likely scenario for how the wreck occurred. And he specifically testified that in order to meet the five accident-reconstruction targets, the wreck only could have occurred in the left lane. Additionally, Dr. Scarber created a simulation using Newton's testimony as to how the wreck occurred—that she was in the right lane when Kirk merged in front of her. That simulation, however, did not meet all five targets.

¶82.   Finally, although Newton testified that Kirk merged into the right lane causing her to hit the trailer, she had provided at least two other accounts of what happened. The amended accident report reflects that Newton told Officer Jones that "[Kirk] passed her, [and] after getting in front[,] the trailer became disconnected from the truck causing her to collide with the trailer. [Kirk] reconnected the trailer and pulled it out of [the] roadway." While Newton

has held that "a motion in limine can be sufficient to preserve an issue for appeal even without a contemporaneous objection during trial . . . ." *Jenkins v. State*, 102 So. 3d 1063, 1065 n.1 (Miss. 2012).

47

may have indicated during her testimony at trial that the officer simply got her statement wrong, Officer Jones testified that he believed that he asked Newton to text the information to him, and he "just copied what was texted." Additionally, Dr. Graves testified that medical documents from the University of Mississippi Medical Center indicated that Newton "state[d] that she was the restrained driver in a rear-end accident at highway speed. Patient stopped suddenly for a braking truck trailer in front of her, and struck the back of the trailer."

¶83. The majority contends that Kirk and Newton "each called other witnesses to bolster their version [of events]." But the only testimony that could possibly bolster Newton's version of events, as she described them at trial, was Deputy Ferrell's inconsistent testimony that there were skid marks in the right lane. This testimony, however, was disputed by Kirk, Officer Jones, and the accident reconstructionist who did not find any evidence in the right lane.[23]

¶84. Finally, the photographs from the scene of the wreck support Kirk's version of the events. Specifically, Exhibit D2-C showing damage to Newton's vehicle and D2-L showing damage to Kirk's trailer, support Kirk's testimony that he was driving in the left southbound lane when Newton, who was driving behind him in the same lane, swerved seconds before hitting the trailer. The photographs do not comport with Newton's testimony that Kirk moved from the left southbound lane into the right southbound lane. The photographs depict

_____

[23] Besides her own testimony, Newton called Kirk as an adverse witness. She also called Deputy Ferrell whose testimony about skid marks has been discussed, and Officer Freeman who testified that he did not have anything to do with the investigation of the wreck. In fact, if Officer Freeman bolstered any witness's testimony, it was Kirk's testimony by confirming that he saw a trash can in the roadway earlier that day. Newton called four additional witnesses, but they testified about her injuries and damages.

48

damage that comports with Kirk's testimony but not with Newton's testimony.

¶85.   For these reasons, I would find that the circuit court abused its discretion in denying the motion for a new trial because the verdict was against the overwhelming weight of the evidence and clearly a result of bias, passion, and prejudice.  Accordingly, I would reverse and remand for a new trial.